# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| LEILANI ZUTRAU individually and on behalf of ICE SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOHN C. JANSING, <br><br> Defendant, <br><br> and <br><br> ICE SYSTEMS, INC. <br><br> Nominal Defendant. | C.A. No. 7457-VCP |

## OPINION

Submitted:  November 21, 2013
Decided:  July 31, 2014

Stephen B. Brauerman, Esq., Vanessa R. Tiradentes, Esq., Sara E. Bussiere, Esq., BAYARD, P.A., Wilmington, Delaware; *Attorneys for Plaintiff Leilani Zutrau.*

Kurt M. Heyman, Esq., Melissa N. Donimirski, Esq., PROCTOR HEYMAN LLP, Wilmington, Delaware; *Attorneys for Defendant John C. Jansing.*

**PARSONS, Vice Chancellor.**

This is an action by a former employee and minority stockholder of a private Delaware corporation specializing in proxy servicing against the president, sole director, and majority stockholder of that corporation. The defendant hired the plaintiff to start working for the company as a controller sometime in 2000 or 2001 and, in 2004, granted the plaintiff a minority equity interest in the company and promoted her to treasurer and, later, executive vice president. Beginning in 2004, the plaintiff and defendant were the sole stockholders of the company, which earns an average of $3 million in revenues per year. Due to differences in management philosophies, among other factors, the defendant fired the plaintiff in 2007.

In 2009, the plaintiff commenced litigation against the defendant in the state of New York, asserting direct claims challenging her termination and derivative claims challenging numerous actions taken by the defendant in the course of running the company. In 2011, the New York court dismissed the plaintiff's derivative claims without prejudice, holding that they would need to be brought in a separate action.

In 2012, the plaintiff commenced this action, effectively reasserting her derivative claims. Shortly thereafter, the defendant executed a reverse stock split in which he cashed out the plaintiff's shares. The plaintiff subsequently amended her complaint to add claims challenging the propriety of the reverse stock split, including direct claims for breach of fiduciary duty, violation of Section 155 of the Delaware General Corporation Law ("DGCL"), and equitable fraud.

Although the plaintiff is no longer a stockholder of the company, the defendant has expressly waived any objection to the plaintiff litigating her derivative claims for

purposes of valuing her interest in the company at the time of the reverse stock split. Any derivative claims that were outstanding at the time of the reverse stock split, therefore, may be treated as corporate assets that should be accounted for when valuing the company.

This Opinion constitutes my post-trial findings of fact and conclusions of law in this matter. In terms of the merits, I begin my analysis with the plaintiff's claim for equitable fraud based on her allegation that the defendant promised her that she would remain a stockholder of the company and benefit from its success until it could be sold, at which time she would share *pro rata* in the resulting proceeds. Plaintiff failed to demonstrate a false representation in connection with that claim, however, because she adduced no evidence that the defendant's alleged promises were false when made. She therefore failed to prove a claim for equitable fraud.

The plaintiff's derivative claims seemingly challenge virtually every decision the defendant made and actions he took, no matter how picayune, in running the company after the plaintiff's termination. The plaintiff failed to prove many of her claims, but did demonstrate that the defendant breached his fiduciary duties to the company by paying himself excessive compensation, by charging certain personal expenses to his company-issued credit card, and by causing the company to pay interest on sums that he withdrew from its credit line for his own purposes.

I then turn to the plaintiff's claims that the defendant breached his fiduciary duties and violated Section 155 of the DGCL by effecting the reverse stock split. Initially, I reject the plaintiff's contention that the defendant effected the reverse stock split for the

2

purpose of depriving her of derivative standing based on a failure of proof. I do hold, however, that the reverse stock split was implemented at an unfair price, in breach of Jansing's fiduciary duties and Section 155. I reach this conclusion because the valuation on which the defendant relied to value the plaintiff's shares did not take into account his pre-existing breaches of fiduciary duty and their impact on the fair value of the company. As a remedy, I award the plaintiff the fair value of her shares.

In that regard, I determine that two adjustments must be made to the valuation that the defendant used to estimate properly the company's fair value. First, the monetary value of the meritorious derivative claims that the company had against the defendant at the time of the reverse stock split should be treated as a non-operating corporate asset and added to the value of the company. Second, because the valuation relied on a discounted cash flow analysis, which, in turn, used the company's historical performance to project its future performance, a normalizing adjustment is required to the historical data to remove expenses incurred as a result of the defendant's excessive compensation during the relevant period, so that the future projections are not artificially suppressed as a result of that self dealing.

Finally, I consider a counterclaim asserted by the defendant in this action. The court presiding over the New York litigation ultimately issued a post-trial opinion in which it awarded the plaintiff $60,307 for the amount remaining in her capital account at the company. The defendant argues that this award should be setoff from any amount he is held to owe the plaintiff in connection with the reverse stock split, because the baseline valuation of the plaintiff's shares for purposes of the reverse stock split already included

3

the value remaining in her capital account. I reject this counterclaim as barred by collateral estoppel, because the same factual argument was made by the defendant to the New York court and ultimately was rejected by that court.

## I.    BACKGROUND[1]

### A.    The Parties

Nominal Defendant, ICE Systems, Inc. ("ICE" or the "Company"), is a Delaware corporation that specializes in proxy services. It is one of only two companies in the United States that provides substantive third party proxy processing to trust institutions, such as banks, that hold shares on behalf of beneficial owners.

Defendant, John Jansing, is the President and sole director of ICE. Before the reverse stock split that is contested by the plaintiff in this action (the "Reverse Stock Split"), Jansing was the majority stockholder of ICE, holding 78% of the shares of the Company. He now purports to be ICE's sole stockholder.

Plaintiff, Leilani Zutrau, is a former ICE employee. Zutrau served as ICE's controller and, at various points during her tenure with the Company, held the position of ICE's Treasurer and oversaw the Company's sales and marketing functions. Before the Reverse Stock Split, Zutrau was a minority stockholder of ICE, holding 22% of the shares in the Company.

---

[1]    Unless otherwise noted, this background is drawn from the stipulated facts section of the parties' First Amended Pre-Trial Stipulation and Order (D.I. No. 177) and from alleged facts admitted in Jansing's Answer to the Third Amended and Supplemental Verified Complaint (D.I. No. 129).

4

## B.   Facts

### 1.   History and business of ICE

ICE was formed as an S corporation under the laws of New York in 1990. In its early years, ICE's principal business activity was providing ballot processing services to trade associations, unions, and public advocacy groups. Jansing acquired an interest in ICE in 1993, becoming one of four equal stockholders in the Company. Although each of the four stockholders initially were employed by ICE, the three stockholders other than Jansing left their positions with the Company in the mid-to-late nineties.[2] In that same time frame, ICE ceased providing ballot processing services, instead becoming active in the proxy services business. Consistent with that change in its business focus, ICE began operating under the name "Proxytrust."[3]

Since entering the proxy services segment, ICE's principal business activity has been providing proxy processing services to trust institutions, typically banks, that hold shares on behalf of individual beneficial owners.[4] ICE serves as an outsourcing solution for these institutions to print, distribute, and tabulate proxies in conjunction with corporate votes initiated by the issuing corporations, or issuers, for any shares that the bank is holding in trust.[5] Thus, ICE serves as an intermediary between beneficial owners

---

[2]   Tr. 445-46 (Jansing). References in this form are to the trial transcript. Where the identity of the testifying witness is not apparent from context, it is indicated parenthetically after the page citation.

[3]   *Id.* at 446.

[4]   Tr. 6-7 (Zutrau); Tr. 448 (Jansing).

[5]   Tr. 448 (Jansing).

of shares and publicly traded corporations, but its direct clients are the trust institutions or banks utilized by those beneficial owners. As of 2012, ICE was providing third-party proxy processing to 176 client banks in the United States. Those clients collectively represented over 850,000 beneficial owners.[6] In any given year, ICE generally processes proxies from over 5,000 corporations.[7]

ICE communicates with its bank and trust clients through "data feeds" established with several trust system providers. A "data feed" allows for a two-way transfer of electronic data between ICE and a trust system provider.[8] Trust system providers process data for banks, including beneficial share owner data that ICE needs to perform the work that it is contracted to do.[9] The data feeds are the lifeline of the Company. To serve its clients and process the data obtained from those feeds, ICE has developed proprietary information processing software.[10] ICE incurs costs to establish and maintain data feeds, but those feeds are of no use to ICE if it does not have bank or trust clients using the particular data feed.[11]

---

[6]     *Id.* at 448-49.

[7]     *Id.*

[8]     *Id.* at 460.

[9]     *Id.* at 460-62.

[10]    *Id.* at 457-58.

[11]    *Id.* at 462-64.

Although ICE's direct clients are trust institutions, issuers are required under securities regulations to reimburse those institutions for the costs of distributing proxies.[12] Thus, ICE ultimately is paid by the issuers. Because of this arrangement, many of the fees that ICE can charge its clients are regulated by the New York Stock Exchange ("NYSE") with oversight from the Securities Exchange Commission ("SEC").[13]

ICE is one of only two companies that provide third-party proxy processing to trust institutions holding shares on behalf of beneficial owners. The other company operating in that space, and ICE's only direct competitor, is Broadridge Financial Solutions, Inc. ("Broadridge").[14] Broadridge, however, dominates the market. It is much larger than ICE, controls over 99% of the market in which ICE operates, and is an aggressive competitor.[15] Among other things, Broadridge provides a wider array of services than ICE does, including services outside of the proxy services sector. In addition, Broadridge offers various services to its clients for free in order to maintain or attract their proxy services business.[16] This has caused ICE to purchase similar services from third parties and offer them to its clients for free, including, for example, tax reporting services from Commerce Clearing House ("CCH").[17]

---

[12]     Tr. 82-83 (Zutrau).

[13]     Tr. 454-55 (Jansing).

[14]     Tr. 6-7 (Zutrau).

[15]     *Id.*; Tr. 449-50 (Jansing).

[16]     Tr. 449-50 (Jansing).

[17]     *Id.* at 452-53.

The proxy services market is highly saturated. Thus, there are very few new or unclaimed clients in the market. That means ICE and Broadridge effectively are engaged in a "zero sum game."[18]

### 2. Zutrau becomes involved with ICE

By 2000, Jansing was the President and sole Director of ICE. In its first ten years of operations, the Company had accumulated over $1 million in debt, which Jansing had guaranteed personally. In 1999, Jansing contracted to sell ICE and its assets to Anne O. Faulk and Boardvote.com, Inc. for $1,425,000. The transaction never closed, however, and instead devolved into litigation.

Following the failed transaction, Jansing retained an individual named Morton Berger as a consultant to help organize the Company and assist with various finance, human resource, and general and administrative tasks.[19] In May of 2000, Berger enlisted Zutrau to help with some of the financial aspects of his consulting work for ICE.[20] Berger and Zutrau were acquainted because Berger served as a director of a company for which Zutrau previously had worked.[21] While she was working at ICE in a consultative capacity, Zutrau purportedly caught Berger engaging in certain financial improprieties,

---

[18]    *Id.* at 456.

[19]    Tr. 467 (Jansing).

[20]    Tr. 9-10 (Zutrau).

[21]    *Id.* at 9.

8

including improperly charging expenses to ICE. Subsequently, Jansing refused to do business with Berger.[22]

At ICE, Zutrau was tasked, among other things, with organizing financial records and managing the Company's accounts payable and accounts receivable.[23] She also had an assignment pertaining to SunGard, a trust systems provider that was ICE's largest business partner and source for client data. In June 2000, Sungard threatened to cancel a joint venture contract with ICE that involved revenue sharing between ICE and SunGard. Sungard had threatened cancellation based on ICE's delinquency in making the payments called for under the agreement.[24] Zutrau reviewed ICE's books and worked with Sungard to resolve those issues. In the course of doing so, Zutrau discovered that ICE actually had overpaid SunGard in the past.[25] Based on Zutrau's discovery, SunGard waived its claim against ICE for delinquent payments.[26]

Pleased with the work that Zutrau had done, Jansing made her a full-time job offer, essentially to serve as ICE's controller, which she accepted.[27] Zutrau formally was given the title "controller" sometime in 2002 or 2003.[28]

---

[22]     Tr. 469 (Jansing).

[23]     Tr. 9-10 (Zutrau).

[24]     *Id.* at 10.

[25]     *Id.* at 151-52.

[26]     Tr. 475-76 (Jansing).

[27]     Tr. 19 (Zutrau); Tr. 469-70 (Jansing).

[28]     Tr. 134 (Zutrau).

According to Zutrau, in the spring of 2001, after she had become a full-time ICE employee, Jansing also offered her equity in the Company.[29] Specifically, Zutrau alleges that Jansing told her that he needed the help of someone with her accounting and financial skills to turn the Company around and promised her an equity stake in ICE if she would commit herself to rehabilitating the Company until it became profitable and could be sold.[30] Jansing purportedly further represented to Zutrau that she would share in the proceeds of the eventual sale of the Company in accordance with the percentage of her equity ownership and that, until such a sale occurred, they both would benefit from their efforts in line with the success of the Company.[31]

Jansing acknowledges having conversations with Zutrau about the possibility of her obtaining equity in the Company, but maintains that they were informal and non-specific. According to Jansing, Zutrau approached him about obtaining equity in the Company.[32] When she first broached the subject, he explained that granting her equity at that time would be difficult because of the Company's three other stockholders.[33] Jansing admits, however, that he thought Zutrau had done good work and told her that he

---

[29]     *Id.* at 17.

[30]     *Id.* at 18.

[31]     *Id.*

[32]     Tr. 477 (Jansing).

[33]     *Id.*

10

would consider her request, stating something along the lines of "[i]f we can ever get around to it, I'll see what I can do."[34]

After her initial discussion with Jansing about equity, Zutrau worked hard to improve the operations of the Company. She continued to serve as its controller, in which role she, among other things, maintained and improved ICE's financial and accounting records, issued statements and invoices, and was responsible for the Company's accounts payable and receivable.[35] Before Zutrau started working at ICE, the Company had no reliable accounting system to track and collect receivables.[36] Zutrau researched software solutions to rectify that problem and discovered a software system called Sage, which was capable of managing ICE's receivables and interfacing with the Company's proprietary system. During Zutrau's employment at ICE, the Company purchased and installed the Sage software system, which it still uses today.[37] Zutrau also assisted in the Company's sales and marketing efforts by helping to produce professional marketing materials and by enrolling the Company in a number of industry conferences each year, some of which she attended personally.[38]

---

[34]    *Id.* at 477-78.

[35]    Tr. at 19 (Zutrau).

[36]    *Id.* at 38-39.

[37]    *Id.*

[38]    *Id.* at 35-36 (Zutrau); Tr. 485–86 (Jansing).

In addition to her work efforts, Zutrau loaned money to ICE on a number of occasions, even before she had acquired an equity interest.[39] Around the time Zutrau began working for ICE, the Company had maxed out its available credit lines.[40] Zutrau then periodically and voluntarily would make unsecured, interest free loans to the Company to help cover operating expenses. ICE repaid those loans when it had sufficient funds available.[41] In total, during her tenure at ICE, Zutrau loaned the Company approximately $400,000,[42] but all of those loans were repaid.[43]

In early 2003, Jansing had discussions with another ICE employee, Jeff Berg, the Company's IT specialist, about the possibility of granting him equity.[44] Zutrau strongly opposed that possibility and wrote a lengthy letter to Jansing in February 2003 expressing her view that Berg was not as deserving as she was.[45] In the letter, Zutrau stated that Berg "put[s] in less time than me, and hasn't yet made a commitment to work above and

---

[39] Tr. 16-17 (Zutrau).

[40] *Id.* at 16.

[41] *Id.* at 16-17, 315; JX 309 at 535.

[42] *See* JX 309.

[43] Tr. 315 (Zutrau).

[44] Tr. 478 (Jansing).

[45] JX 533. At trial, Zutrau denied being opposed to Berg receiving equity in the Company. Tr. 166-67. The clear import of her letter to Jansing, however, belies her testimony in that regard. I also credit Jansing's testimony that Zutrau orally advised him of her opposition to Berg receiving stock. Tr. 478.

beyond the normal work responsibilities."[46]  The letter also noted that "although [Zutrau] gave without having a formal arrangement," she had stuck to the parties' "original understanding" and had "been working for equity of some sort."[47]  Ultimately, Berg chose not to accept any equity in the Company, instead opting to receive a higher salary.[48]

### 3.  Zutrau becomes a stockholder of ICE

In late 2003, Zutrau followed up with Jansing about receiving stock in the Company.  Jansing responded that he would grant her equity, but that the other three stockholders would need to be bought out for that to occur.[49]  Jansing then retained corporate governance attorneys ("ICE's Counsel") on behalf of ICE to issue stock to Zutrau, buy out the three non-participating stockholders, and reorganize ICE.

Because there were still other stockholders in addition to Jansing, and to legitimize the transfer of stock to Zutrau, ICE's Counsel recommended that the Company adopt a Stock Incentive Plan (the "Plan") as a vehicle to grant Zutrau stock.  The Plan was implemented in December 2003.[50]  In April 2004, before any equity had been issued under the Plan, ICE's Counsel prepared a Restricted Stock Agreement ("RSA") to

---

[46]  JX 533.

[47]  *Id.*

[48]  Tr. 478-79 (Jansing).

[49]  Tr. 22-23 (Zutrau).

[50]  JX 24.

formalize the terms of the stock issuance to Zutrau.[51] Zutrau reviewed the RSA and discussed its terms with ICE's Counsel before it was executed on April 23, 2004.[52]

Pursuant to the RSA, Zutrau received 36 shares of common stock in ICE, which fully vested on May 22, 2004. Among other things, the RSA contained an integration clause, which stated that "[t]his Agreement together with the Plan contain the entire agreement and understanding of the parties relating to the subject matter hereof, and supersede[s] all prior agreements, understandings, representations, warranties and covenants of any kind between the parties with respect to this subject matter."[53]

On May 25, 2004, ICE was reorganized and reincorporated in Delaware, and the original ICE Systems, Inc., the New York S corporation ("ICE NY"), was dissolved. In connection with the reorganization, the three non-participating stockholders were bought out with funds lent to the Company by Zutrau.[54] Zutrau's recently issued shares in ICE NY were converted to a 22% equity stake in ICE, the newly formed Delaware S corporation. Following the reorganization, Jansing owned the remaining 78% of ICE's stock.

Around the time of the reorganization, Jansing reiterated his promise that, together, he and Zutrau would improve ICE so that it could be sold and they could share

---

[51]     JX 472; Tr. 29-30 (Zutrau).

[52]     Tr. 29-30 (Zutrau).

[53]     JX 472 § 10.

[54]     Tr. 24 (Zutrau).

the resulting proceeds.[55] Zutrau further alleges that Jansing told her at that time that he did not want her to incur tax liabilities in connection with her equity ownership.[56]

### 4. ICE's operations after Zutrau became a stockholder

After the reorganization and issuance of stock to Zutrau, Jansing remained ICE's President and sole director.[57] On August 4, 2004, Jansing executed a Unanimous Written Consent (the "Consent"), as the sole director, that (1) abolished the Plan and (2) elected Zutrau to serve as ICE's Treasurer. Zutrau's responsibilities as Treasurer were similar to her responsibilities as ICE's controller and included overseeing ICE's books and records and making sure that they were kept in order.[58]

Both before and after the reorganization, ICE operated on a fairly informal basis. The Company had no written budget and did not have its books audited.[59] ICE also had no written policy regarding business or travel expenses,[60] which Jansing and certain other employees charged directly to Company credit cards.[61] Instead, ICE had an informal

---

[55] *Id.* at 24, 27, 30-31.

[56] *Id.* at 24-25, 30-31. In an S corporation, by contrast to a C corporation, the stockholders, not the corporation itself, are liable for the taxes on the corporation's net earnings. 26 U.S.C.A. § 1363 (2005) ("The taxable income of an S corporation shall be computed in the same manner as in the case of an individual . . . .").

[57] Tr. 481-82 (Jansing); JX 196 ¶ 2.

[58] Tr. 135-36 (Zutrau).

[59] Tr. 195-97 (Zutrau).

[60] *Id.* at 192-93; Tr. 482 (Jansing).

[61] Tr. 586-87 (Jansing).

policy that employees should be mindful of their expenditures and generally avoid expensive meals and lodging.[62] Zutrau typically reviewed business expenses charged by Company employees as well as other payments made by the Company when she entered them into ICE's accounting system.[63] If Zutrau found any charges or payments that she considered to be inappropriate, such as charges or payments for personal or non-business expenses, she brought them to Jansing's attention.[64] In that regard, during her tenure at ICE, Zutrau prompted Jansing to reimburse ICE for a number of personal expenses he had charged to his Company credit card.[65] For his part, Jansing maintains that those expenses were negligible and amounted to no more than a few thousand dollars.[66]

Similarly, ICE lacked a formal policy on compensation.[67] Zutrau provided some input on that topic,[68] but Jansing made the ultimate determination regarding how much to pay employees, including himself and Zutrau, both in salary and bonuses.[69]

After becoming a stockholder, Zutrau continued to make periodic loans to the Company and, in addition, used her creditworthiness to benefit ICE on several occasions.

---

[62]    Tr. 192-93 (Zutrau); Tr. 482-83 (Jansing).

[63]    Tr. 37, 341 (Zutrau).

[64]    *Id.* at 37.

[65]    *Id.* at 37-38.

[66]    Tr. 483-84.

[67]    Tr. 191 (Zutrau); Tr. 484 (Jansing).

[68]    Tr. 191 (Zutrau).

[69]    *Id.*; Tr. 485 (Jansing).

In December 2004, Jansing and Zutrau signed as co-guarantors on ICE's new five-year office lease, which commenced in early 2005.[70] In that same month, Zutrau signed for and co-guaranteed, with Jansing, an auto loan in the Company's name for a truck to be used by Jansing.[71] In February 2007, Zutrau obtained and, together with Jansing, co-guaranteed a $250,000 business line of credit for ICE with Citibank, N.A. (the "Credit Line").[72] The funding made available to ICE from the Credit Line obviated the need for Zutrau to make personal loans to the Company.[73] In each of these instances, however, Zutrau's creditworthiness facilitated the Company's actions because Jansing had poor personal credit.[74]

In early 2005, Jansing hired an individual named Walter Lotspeich to serve as a "relationship manager."[75] In that sales and marketing role, Lotspeich was responsible both for maintaining ICE's existing business relationships and for attempting to establish new ones. Jansing previously had interacted with Lotspeich in various business settings, including as an employee of one of ICE's clients, and had developed a good working relationship with him.[76] Each party to this dispute alleges that the other party was

---

[70] JX 36.

[71] Tr. 32 (Zutrau); Tr. 496 (Jansing).

[72] Tr. 32, 52 (Zutrau); Tr. 500 (Jansing).

[73] Tr. 52 (Zutrau).

[74] *Id.* at 33-34; Tr. 496, 572-73 (Jansing).

[75] Tr. 36-37 (Zutrau).

[76] Tr. 514-16 (Jansing).

17

concerned that Jansing and Lotspeich's pre-existing relationship would hinder Jansing's ability to supervise Lotspeich effectively, and insisted that Zutrau serve as his direct supervisor.[77] Regardless of who, in fact, proposed that arrangement, in February of 2005, Zutrau's job duties were expanded to include supervising Lotspeich and overseeing the sales and marketing functions of the Company. As part of that division of duties, Jansing and Zutrau agreed that Jansing would focus on the Company's internal operations.[78] Around that time, Zutrau also was given the title of "executive vice president."[79]

When Zutrau became more involved in the Company's marketing efforts, she helped organize an annual golf outing that ICE hosted for marketing purposes.[80] She also assisted in various giveaways and other marketing efforts, such as creating promotional ICE gear.[81] In 2005 and 2006, the Company added approximately eighty new clients and successfully negotiated contracts with additional business partners. Zutrau signed on a few additional clients herself, but Lotspeich primarily was responsible for making sales presentations to and signing new clients.[82] In early to mid-2007, ICE was pursuing

---

[77]     Tr. 213, 216-17 (Zutrau); Tr. 517-18 (Jansing).

[78]     Tr. 216-17 (Zutrau); Tr. 518 (Jansing).

[79]     Tr. 134 (Zutrau); Tr. 481 (Jansing).

[80]     Tr. 300-01 (Zutrau); JX 554, 618, 621, 622.

[81]     Tr. 493 (Jansing).

[82]     Tr. 222-23 (Zutrau); Tr. 520-21 (Jansing).

several banks in an effort to switch them from Broadridge to ICE, including M&I, Investors Bank & Trust, US Bank, LaSalle Bank, Mitsubishi Trust, and Mizuho Trust.[83]

Between 2000 and 2006, the Company had grown significantly larger and more successful. In 2000, ICE's gross revenues were $652,000 and the Company had over $1 million in long term debt.[84] By 2006, gross revenues had risen to approximately $2.6 million and the Company had paid off nearly all of its long term debt.[85] Moreover, by the end of 2006, the Company had been profitable for two consecutive years.[86] As ICE grew more successful, Jansing's and Zutrau's compensation also increased. In 2000, Zutrau and Jansing were compensated at the annual rates of $75,000 and $85,000, respectively. By 2006, Zutrau and Jansing's base annual salaries had grown to $180,000 and $200,000.[87] Moreover, in that year, Zutrau and Jansing collectively received more than $1 million from ICE in total compensation, distributions, and benefits.

### 5. Companies express interest in acquiring ICE

Due to its success, ICE received expressions of interest from a few potential acquirers in 2006. In January of that year, Jansing and Zutrau met with the CEO and another senior executive from Institutional Shareholder Services ("ISS"), which specializes in providing proxy voting recommendations to trust institutions based on their

---

[83] Tr. 224-27 (Zutrau); Tr. 537-39 (Jansing); JX 293 at 22.

[84] JX 8.

[85] JX 293 Exs. 5.0, 5.1.

[86] *Id.* Ex. 5.1.

[87] JX 518.

preferred investment strategies.[88] Although the discussions were informal, the ISS executives expressed interest in the possibility of partnering with or acquiring ICE.[89] Jansing ultimately decided not to pursue a transaction with ISS, instead adopting a "wait and see" approach.[90]

In November 2006, ICE also received an expression of interest from Computershare Limited ("Computershare"), a multinational company that engaged in limited proxy distribution activities in the United States.[91] Computershare expressed interest in acquiring ICE so that it could leverage ICE's business and technology to expand its operations in the U.S. proxy services sector. From November 2006 through May 2007, Jansing and Zutrau participated in discussions with Computershare regarding a potential acquisition.[92] Contemporaneous notes taken by Zutrau as well as notes emailed to Jansing and Zutrau by a Computershare representative indicate that, at a meeting held in late February or early March of 2007, the parties discussed the possibility of Computershare acquiring all of the equity in ICE for up to $25 million in total consideration, consisting of $8 million in cash upfront with a potential $17 million earn-

---

[88]    Tr. 40-42 (Zutrau).

[89]    *Id.* at 41.

[90]    *Id.* at 43-44.

[91]    *Id.* at 44; Zutrau Del. Dep. 189; Paul Conn Dep. 7.

[92]    Tr. 45-46 (Zutrau).

out.[93] Computershare never made a firm offer to acquire the Company, however, and discussions between ICE and Computershare terminated without a deal being reached.[94]

### 6.    Zutrau is Terminated from ICE

Despite Zutrau's contributions to the Company, Jansing testified that a negative side of her involvement emerged in the 2004–2007 timeframe. According to Jansing, Zutrau did not get along well with the Company's other employees and had an abrasive management style that regularly brought her into conflict with the people under her.[95] For example, on one occasion, Zutrau insisted that Jansing write up an employee for insubordination, which he did, to his later regret.[96] The employee subsequently resigned because she felt Zutrau had targeted her unfairly.[97] Zutrau also had a tendency to micromanage the employees who reported to her. Ultimately, that caused Lotspeich to

---

[93]    JX 480, 481; *see also* Tr. 46-48 (Zutrau).

[94]    Tr. 524 (Jansing). Zutrau claims that in late May or early June 2007, Garet Hill, a consultant who had been retained by Computershare, made a verbal final offer to Jansing on behalf of Computershare to acquire the Company for $25 million. Tr. 236-37. There is no documentary evidence that such an offer was made, however, and Zutrau admits that she was not present when the purported offer was communicated to Jansing and that Jansing did not discuss the details of the offer with her. Rather, she alleges only that Jansing told her that some kind of an offer had been made. *Id.* at 237-38. Jansing, Hill, and Paul Conn, a Computershare executive who participated in the negotiations with ICE, however, all testified that Computershare never made a final offer to acquire ICE. Tr. 524 (Jansing); Hill Dep. 45-46, 64; Conn Dep. 132-33. Having considered the available evidence, I find that no such "final" or firm offer was ever made.

[95]    Tr. 512-13.

[96]    *Id.* at 513-14.

[97]    *Id.* at 514.

21

threaten to leave the Company, citing a desire for greater autonomy, among other things.[98]

Zutrau's management style also conflicted with that of Jansing, who gave priority to employee morale. Although Jansing had the final say, he and Zutrau clashed over a variety of issues such as whether certain employees should be required to clock in and out.[99] They also had disagreements regarding the salary and bonuses employees should receive, with Jansing generally wanting to pay employees more.[100] Zutrau's supervision of Lotspeich became another source of tension between her and Jansing. After Lotspeich was placed under Zutrau's supervision, she attempted to restrict any direct communication between Lotspeich and Jansing, apparently concerned that such communications would undermine her authority.[101] Indeed, if Zutrau discovered Lotspeich and Jansing communicating without her knowledge, even about non-work-related matters such as a sporting event, she became irate and proceeded to chastise one or both of them.[102]

By June of 2007, Jansing had concluded that Zutrau was a "toxic element in the office" and resolved to terminate her.[103] Shortly before that, Zutrau had been diagnosed

---

[98] Lotspeich Dep. 60-61; Tr. 209-12 (Zutrau); JX 512.

[99] Tr. 529 (Jansing); Lotspeich Dep. 72-76.

[100] Tr. 485 (Jansing).

[101] *See id.* at 517, 519-20; JX 476, 544, 545, 547.

[102] *See* Tr. 519-20 (Jansing); JX 476, 544.

[103] Tr. 529, 567 (Jansing).

22

with metastatic cancer, for which she was scheduled to go on medical leave sometime in mid-June.[104] Zutrau had postponed her medical leave until the end of June, however, to help prepare for an internal financial audit of the Company, which one of the Company's clients had requested.[105] Jansing was aware of Zutrau's diagnosis as well as her intention to take a medical leave of absence.[106]

On June 19, 2007, Jansing removed Zutrau's name and signatory power from all Company bank accounts, a credit card account, and a retirement benefits administration account, but left Zutrau's name as a co-guarantor on the Credit Line. On that same day, Jansing withdrew the full $250,000 available on the Company's Credit Line and placed it in his personal Citibank account. Jansing testified that his banker at Citibank advised him to hold that amount in his personal account until a new credit line could be approved.[107] According to Zutrau, however, Jansing made it impossible, by doing so, for Zutrau to remove herself as a guarantor on the Credit Line.[108] The Company made the interest payments on the Credit Line after Jansing's withdrawal.

---

[104] Tr. 86 (Zutrau).

[105] *Id.*

[106] At trial, Jansing denied knowing about Zutrau's planned medical leave, Tr. 570-71, but I consider that testimony unreliable. In a prior deposition in the related New York Action, Jansing admitted that Zutrau requested to be able to take time off to deal with her medical condition and stated that he approved that request. Jansing N.Y. Dep. 133-34.

[107] Tr. 500-01.

[108] Tr. 87-88.

23

On June 20, 2007, Jansing officially terminated Zutrau without giving her any prior notice. Rather, when Zutrau arrived at the Company, she discovered that the locks had been changed.[109] Although she attempted to speak with Jansing over the phone, he did not take or return her call.[110] Instead, Jansing faxed Zutrau a formal termination letter sometime that day.[111] He also did not provide Zutrau with any severance pay and cancelled her healthcare coverage.[112]

On June 22, 2007, Jansing made a $271,000 down payment, including closing costs, on a new home in Southampton, New York.[113] The amount of the down payment is similar to the amount Jansing withdrew from the Credit Line and placed into his Citibank account two days earlier, but Zutrau failed to prove that the two transactions were related. The funds for the down payment came from Jansing's personal bank account at United States Trust, not his Citibank account.[114] After he had withdrawn the funds from the Credit Line, Jansing maintained the balance in his Citibank account at

---

[109]    Tr. 80 (Zutrau).

[110]    Tr. 569 (Jansing).

[111]    *Id.* at 567-68; JX 94.

[112]    Tr. 585 (Jansing).

[113]    *Id.* at 509-12 (Jansing); JX 341, 482.

[114]    Tr. 509-12 (Jansing); JX 482.

approximately $250,000, and at all times greater than $240,000, until he used the funds in that account to repay the balance on the Credit Line on November 27, 2007.[115]

Citibank records subpoenaed by Zutrau indicate that Jansing did not apply for a new credit line with Citibank in or after June 2007.[116]  Rather, Jansing applied for an extension of the existing Credit Line in October 2008.[117]  Citibank approved that application in December 2008 and expanded the Credit Line to $500,000.  By that time, Zutrau had been removed as a co-guarantor.[118]

### 7.    ICE's operations after Zutrau's termination

Following Zutrau's termination, Jansing hired Eric Henriksen to perform many of the day-to-day bookkeeping functions for which Zutrau had been responsible, including paying bills, tracking collections, and invoicing.[119]  Jansing also began to rely on Maurice Kalaygian, Jansing's personal accountant, to serve as the Company's tax accountant.[120] Jansing did not appoint a replacement Treasurer.[121]

---

[115]    JX 692; Tr. 502-03 (Jansing).  Jansing apparently intended to keep the amount in the Citibank account above $250,000 until the Credit Line was repaid, and the handful of times the amount in that account dipped below $250,000 resulted from poor bank management on his part.  Tr. 502-03 (Jansing).

[116]    *See* JX 221.

[117]    JX 221 at 30-32.

[118]    Tr. 250 (Zutrau); Tr. 502 (Jansing).

[119]    Tr. 582-83 (Jansing).

[120]    *Id.* at 583-84.

[121]    *Id.* at 585-86.

ICE encountered some accounting difficulties after Zutrau's termination. First, ICE experienced significant problems with the Sage accounting software it had been using. Among other things, those problems threatened the integrity of ICE's historical accounting data and prevented the Company from keeping its accounting records up-to-date.[122] ICE retained an outside computer consultant, Exeplex, to assess these problems and make recommendations for how to resolve them. Exeplex ultimately recommended that the Company take several actions, including catching up on previously released Sage upgrades, which it did.[123] The Company also paid for Henriksen to receive formal training in Sage.[124] In addition, the record shows that Zutrau had experienced difficulties with Sage during her time at ICE, due at least in part to ICE's failure regularly to update its software.[125]

Second, Jansing and Henriksen initially had trouble determining how to generate the Sungard revenue sharing reports. Zutrau previously had been responsible for that function and there were no written procedures in place as to how to generate the reports.[126] At one point, Henriksen asked Zutrau to help with the Sungard account. Zutrau offered to provide assistance, but only if she would be compensated. Jansing and

---

[122]    *Id.* at 529-32; JX 653, 654.

[123]    Tr. 531-32 (Jansing); JX 653, 654.

[124]    Tr. 531 (Jansing).

[125]    JX 612.

[126]    Tr. 533 (Jansing).

26

Henriksen, with assistance from Exeplex, eventually resolved the issues related to Sungard independently.[127]

In most other respects, ICE's operations remained similar to how they had been before Zutrau's termination. As ICE's sole director, president, and majority stockholder, Jansing continued to have the authority to make all major decisions on behalf of the Company, including compensation and bonus decisions for himself and ICE's employees.[128] ICE continued to engage in various marketing activities begun while Zutrau was with ICE, such as the annual golf outing, and Lotspeich remained the primary driver behind the Company's direct sales efforts.[129] Although Lotspeich pursued the bank leads ICE had identified in the first half of 2007, his efforts did not produce any additional clients.[130] Certain of the targeted banks were acquired by other banks during that same timeframe.[131]

Following Zutrau's termination, ICE had further contact with Computershare and ISS. About a month after the termination, Hil sent Jansing an email referencing ongoing strategic discussions between Computershare and ICE and telling Jansing to "let me know if you need a buyer for the 20% equity position," an apparent reference to Zutrau's

---

[127]    *Id.*

[128]    *Id.* at 485.

[129]    *Id.* at 520, 537-39; JX 202, 364, 378, 668.

[130]    Tr. 537-39 (Jansing); JX 650.

[131]    Tr. 226-27 (Zutrau); Tr. 538-39 (Jansing); JX 643, 674.

minority stake.[132] Later, in March 2008, Zutrau approached Computershare to gauge their interest in acquiring her equity in ICE.[133] Computershare expressed some interest initially and took steps toward executing a non-disclosure agreement.[134] According to Zutrau, Computershare contacted Jansing at some point during their discussions and then abruptly ceased its discussions with her.[135] Shortly thereafter, Zutrau alleges that Jansing, through counsel, offered her $150,000 for her shares in ICE.[136] Jansing denies ever making such an offer.[137]

In 2009, ISS again approached Jansing about acquiring ICE. After preliminary due diligence, ISS submitted a non-binding indication of interest in acquiring ICE for

---

[132] JX 100. At trial, Jansing claimed that this statement referred to earlier conversations regarding Computershare purchasing an unrelated minority stake in ICE. Tr. 525-27 (Jansing). Based on the timing and phrasing of the email, however, I find that it was more likely a reference to Zutrau's equity position. *See* Tr. 49-52 (Zutrau).

[133] Tr. 242 (Zutrau).

[134] *Id.* at 127; JX 127. In an internal Computershare email dated March 25, 2006, Conn wrote "[w]e might be able to pick this up [*i.e.*, Zutrau's shares] for circa $500K or $500K-$1M (vs $4M+ If you assumed we'd had any interest in paying $20-25M for the whole company, which we didn't. We thought it was worth approx $10M)." JX 127.

[135] Tr. 242, 127.

[136] *Id.* at 243.

[137] Tr. 528.

$2.5 million, with a maximum earnout potential of $4 million.[138] But ISS terminated those discussions after its parent company was acquired.[139]

In terms of overall performance, ICE has experienced slight growth since 2006, with gross revenues for the past several years averaging at or just under $3 million per year.[140] ICE's most profitable year on record was 2009, when revenues spiked due to certain non-recurring business and the Company became more current on its receivables resulting in a net profit of nearly $1 million.[141] From 2010 to 2012, the last year for which the parties provided financial information, ICE recorded an overall net loss of approximately $200,000 and operated at a loss in two of those three years.[142]

The parties dispute the reasons for ICE's recent lack of profitability. Zutrau blames it on, among other things, mismanagement, wasteful spending, and overcompensation of Jansing and ICE employees, citing overall net increases in payroll, fringe benefit, and travel and entertainment expenses.[143] Jansing attributes the increases in ICE's payroll and fringe expenses to its expanded staff, which has grown by three or four employees since 2006 and currently stands at thirteen,[144] and to ever increasing

---

[138] JX 375.

[139] Tr. 49 (Zutrau).

[140] JX 293 Ex. 5.1.

[141] *Id.*; *see* Tr. 539-40 (Jansing).

[142] JX 293 Ex. 5.1.

[143] *See id.*; Tr. 94-96, 106-09 (Zutrau).

[144] *See* Tr. 108, 318 (Zutrau); Tr. 449 (Jansing).

healthcare costs.[145] Jansing also dismisses as insignificant the travel and entertainment expenses that Zutrau questions. Instead, he emphasizes that ICE's bottom line also has suffered due to increased competition from Broadridge, which has forced ICE to pay for and provide additional free services to its clients.[146]

In her complaint, Zutrau challenges, among other things, a wide array of the decisions Jansing made and actions he took in running the Company after her termination, claiming they constituted breaches of his fiduciary duties. To avoid unnecessary repetition, I defer until the analysis portion of this Opinion many of the other facts pertinent to the specific acts and decisions that Zutrau disputes.

### 8. The New York Action

In March of 2008, Zutrau sent a formal request to inspect books and records of ICE. Following Jansing's refusal to comply with that request, Zutrau commenced a books and records action against Jansing and the Company in the Supreme Court of the State of New York for the County of Suffolk (the "New York Court"). On August 1, 2008, the New York Court ordered Jansing to produce ICE's responsive books and records to Zutrau.[147]

In September 2009, Zutrau filed another complaint against Jansing and ICE with the New York Court, broadly asserting: (1) direct claims challenging her termination; and (2) derivative claims based on numerous actions taken by Jansing in the course of

---

[145]   Tr. 534-35.

[146]   *Id.* at 449-54, 534-35.

[147]   JX 140.

30

running the Company (the "New York Action").[148]   One of the direct claims Zutrau

brought against Jansing was for breach of an alleged oral agreement to employ her until

the Company could be sold.

In October 2011, the New York Court issued an opinion on Jansing and ICE's

motion for summary judgment.[149]   In that opinion, the New York Court dismissed

Zutrau's derivative claims without prejudice, holding that they needed to be brought in a

separate action.[150]   Zutrau later reasserted those derivative claims and others in this

action.   The New York Court also granted summary judgment in favor of Jansing on

Zutrau's breach of contract claim, based on the integration clause in the RSA.[151]

The remaining claims in the New York Action were tried in July and September

2012.   In its post-trial opinion, issued in March 2013, the New York Court entered

judgment against Zutrau on all but one of her remaining claims.[152]   The one claim on

which the court ruled in Zutrau's favor was a claim for $60,307 that remained in Zutrau's

accumulated capital account at ICE.[153]   In its opinion, the New York Court made several

other findings and rulings that are relevant to this action, including that the bonuses

Jansing received in the years following Zutrau's departure were not, as Zutrau claimed,

---

[148]   JX 672.

[149]   *Zutrau v. Ice Sys., Inc.*, 2011 WL 5137152 (N.Y. Sup. Ct. Oct. 28, 2011).

[150]   *Id.* at *4.

[151]   *Id.* at *3-4.

[152]   *Zutrau v. Ice Sys., Inc.*, 2013 WL 1189213 (N.Y. Sup. Ct. Mar. 20, 2013).

[153]   *Id.* at *8.

disguised stockholder distributions as to which she was entitled to receive her *pro rata* share.[154] The New York Court further held that any challenges to the amounts of the bonuses themselves would need to be pursued as derivative claims in this action.[155] The court also held that a *pro rata* share of the stockholder distributions that ICE actually did make after Zutrau's termination had been credited properly to Zutrau's accumulated capital account. As a result, the Court awarded to Zutrau as damages the approximately $60,307 that remained in that account.[156]

### 9.    The Reverse Stock Split

In December 2011, after the New York Court had dismissed the derivative claims without prejudice and before the commencement of this action, Jansing retained Farrell Fritz, P.C. as counsel to advise him regarding how to accomplish a reverse stock split.[157] On January 13, 2012, Jansing, through counsel, engaged Duff & Phelps, LLC for the purpose of "estimating [the] Fair Value of 100 percent of the Shareholders' Equity of ICE Systems as of a current date to be provided by [Farrell Fritz]."[158]

On June 11, 2012, after the filing of this action and shortly before his answer was due, Jansing filed an amendment to ICE's Certificate of Incorporation ("COI") purporting to effect a reverse stock split of all outstanding shares of the Company's common stock

---

[154]    *Id.* at *6.

[155]    *Id.* at *7.

[156]    *Id.* at *6-8.

[157]    JX 496.

[158]    JX 497.

32

(the "Reverse Stock Split"), thereby eliminating Zutrau's ownership interest in ICE. Jansing relied on a Duff & Phelps report dated June 11, 2012 as the basis for valuing Zutrau's 22% interest in the Company. Duff & Phelps estimated the fair market value of 100% of the equity in the Company as of June 5, 2012 as being $2,217,233.[159] Thus, in connection with the Reverse Stock Split, ICE valued Zutrau's approximately 22% interest at $495,779, reflecting her *pro rata* share of the Duff & Phelps valuation with no minority discount. ICE sent Zutrau a check for that amount, but she never deposited it.[160]

Of relevance to this action, the New York Court, in its post-trial opinion, rejected for lack of evidence an argument by Jansing that the $60,307 left in Zutrau's accumulated capital account already had been incorporated into ICE's valuation of Zutrau's equity interest for purposes of the Reverse Stock Split.[161] On that basis, the Court awarded Zutrau $60,307 in damages, notwithstanding the $495,779 that had been tendered to her in connection with the Reverse Stock Split.

### C.     Procedural History

On April 25, 2012, Zutrau commenced this litigation by filing a verified complaint against Jansing in which she effectively reasserted the derivative claims that had been severed from the New York Action. Those claims challenged the manner in which Jansing ran the Company following her termination. Zutrau subsequently amended her complaint.

---

[159]     JX 500 at 8.

[160]     JX 501; Tr. 131 (Jansing).

[161]     *Zutrau*, 2013 WL 1189213, at *8.

On June 19, 2012, following the Reverse Stock Split, Jansing moved to dismiss Zutrau's amended complaint on the grounds that Zutrau lacked standing to pursue her derivative claims because she no longer owned ICE stock. On August 3, 2012, Zutrau filed a second amended and supplemental complaint that addressed the Reverse Stock Split. The new pleading asserted derivative and direct claims for breach of fiduciary duty and direct claims for failure to pay fair value for Zutrau's cashed-out stock under 8 *Del. C.* § 155 and for equitable fraud and negligent misrepresentation.

On September 21, 2012, Jansing moved to dismiss the second amended and supplemental complaint for failure to state a claim and on *res judicata* and collateral estoppel grounds.[162] In a Memorandum Opinion issued on March 18, 2013, I held that Jansing had failed to show that dismissal of any of the claims asserted by Zutrau was warranted and denied Jansing's motion in its entirety.[163]

On April 2, 2013, Jansing filed his answer to the second amended and supplemental complaint. In that pleading, Jansing also asserted two verified counterclaims, the first of which he later withdrew. The remaining counterclaim sought a

---

[162] In his reply brief in support of the motion to dismiss, Jansing raised several additional arguments against Zutrau's equitable fraud and negligent misrepresentation claims, including that they constituted an impermissible "bootstrap" of the breach of contract claim she asserted in the New York Action and "face[d] serious laches and statute of limitations obstacles." Def.'s Reply Br. in Supp. of the Mot. to Dismiss Pl.'s Second Am. Compl. 6-8. Because those arguments had not been addressed in Jansing's opening brief, however, I deemed them to be waived for purposes of his motion to dismiss. *Zutrau v. Jansing*, 2013 WL 1092817, at *6 (Del. Ch. Mar. 18, 2013).

[163] *Zutrau*, 2013 WL 1092817, at *6.

setoff of the $60,307 in damages awarded in the New York Action against any amount awarded to Zutrau in connection with the Reverse Stock Split.

On May 15, 2013, Zutrau filed her third amended and supplemental verified complaint (the "Complaint"), adding claims challenging the amount of Jansing's compensation.

In a pre-trial conference held on July 25, 2013, the Court heard argument on two motions to compel filed by Zutrau as well as a motion in limine by Jansing to exclude the amended report of Zutrau's valuation expert, Roy D'Souza. The Court ordered Jansing to produce his personal tax returns in response to Zutrau's second motion to compel, but reserved decision on the remaining motions and asked the parties to address any issues that remained outstanding in post-trial briefing.

From July 31 to August 2, 2013, I presided over a three-day trial in this action. After extensive post-trial briefing, counsel presented their final arguments on November 21, 2013. This Opinion constitutes my post-trial findings of fact and conclusions of law in this matter.

### D.    Parties' Contentions

Zutrau asserts numerous claims against Jansing related to his conduct in running the Company after her termination and his execution of the Reverse Stock Split. As to Jansing's conduct in running the Company, Zutrau has asserted a derivative claim for breach of fiduciary duty, challenging a broad array of Jansing's actions and decisions. Specifically, Zutrau claims that Jansing breached his fiduciary duties by, among other things, failing to replace her with someone who could provide competent financial

35

oversight of the Company, paying unreasonable compensation to himself and his employees, causing ICE to pay for his personal expenditures, and wasting ICE's corporate assets.

Regarding the Reverse Stock Split, Zutrau brought a direct claim for breach of fiduciary duty, asserting that Jansing executed the Reverse Stock Split for the improper purpose of depriving her of derivative standing, thereby rendering the Reverse Stock Split invalid. Alternatively, Zutrau alleges that the Reverse Stock Split was executed at an unfair and inadequate price, in breach of Jansing's fiduciary duties and in violation of 8 *Del. C.* § 155. Zutrau also argues that Jansing is liable for equitable fraud because he previously had represented to her that she would retain her equity in ICE until the Company could be sold, at which time she would share in the profits of the sale on a *pro rata* basis.[164] As a remedy for Jansing's alleged breaches of fiduciary duty and equitable fraud, Zutrau seeks rescission of the Reverse Stock Split and dissolution of the Company. Alternatively, Zutrau requests that the Court award money damages to her and to ICE as compensation for Jansing's wrongful conduct.

In his defense, Jansing contends that most of Zutrau's claims regarding his running of ICE after her termination challenge disinterested business decisions and, therefore, are protected by the business judgment rule and by the Company's exculpatory

---

[164] The Complaint characterizes Zutrau's fraud claim as being one for "Equitable Fraud / Negligent Misrepresentation." Compl. 22. Zutrau, however, made no reference to her claim for negligent misrepresentation at all in her post-trial briefs. Thus, she has waived that aspect of her fraud claim. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

charter provisions adopted pursuant to 8 *Del. C.* § 102(b)(7). For other decisions that Zutrau challenges, Jansing alleges that he relied in good faith upon the advice of experts and is thus shielded from liability under 8 *Del. C.* § 141(e). As to Zutrau's challenge to his compensation, Jansing avers that the compensation he received at the Company was reasonable, as confirmed by the analysis and report submitted by his compensation expert. Jansing attempts to brush off Zutrau's remaining claims that he caused the Company to pay for his personal expenditures as largely unsubstantiated and, in any event, involving amounts that are *de minimis*.

As to the Reverse Stock Split, Jansing claims that he initiated it as a means of bringing closure to the contentious relationship between the parties and not to deprive Zutrau of derivative standing. In that regard, Jansing emphasizes that he has not objected to Zutrau litigating the derivative claims for the purpose of determining her *pro rata* share of the value of those claims at the time of the Reverse Stock Split. He acknowledges that those claims could entitle Zutrau to additional consideration. Jansing also contends that the Duff & Phelps report fairly valued the equity of the Company, has not been rebutted effectively, and provided an appropriate basis for valuing Zutrau's interest. In addition, Jansing urges this Court to reject Zutrau's claims for equitable fraud because the facts are not as Zutrau alleges, Zutrau failed to prove the elements of equitable fraud, and the fraud claim is barred by the statute of limitations and the doctrine of laches.

Jansing also asserts that the $60,307 left in Zutrau's accumulated capital account, which the New York Court awarded to Zutrau as damages, already had been incorporated

into ICE's valuation of Zutrau's equity interest for purposes of the Reverse Stock Split. Thus, in a counterclaim, Jansing seeks a setoff of the $60,307 from any amount awarded to Zutrau in connection with the Reverse Stock Split.[165]

## II. ANALYSIS

In this analysis, I first consider Zutrau's claim against Jansing for equitable fraud. I then address Zutrau's derivative claim for breach of fiduciary duty based on Jansing's conduct in running the Company following her termination. Next, I examine Zutrau's claims challenging the validity and fairness of the Reverse Stock Split. Finally, I address the appropriate relief for any wrong Zutrau has established and Jansing's counterclaim for a monetary setoff from any amount awarded to Zutrau in connection with the Reverse Stock Split.

### A. Equitable Fraud

In Delaware, the elements of common law fraud are as follows: "(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to

---

[165] In response, Zutrau has alleged that, but for improper and self-interested accounting by Jansing and his accountant, her accumulated capital account would have contained an additional $118,461. Thus, Zutrau denies that Jansing is entitled to deduct the New York Court's award of $60,307 from any amounts that she is owed in connection with the Reverse Stock Split.

the plaintiff as a result of such reliance."[166] The elements of equitable fraud are the same as those of common law fraud, except that "there is no requirement that the defendant have known or believed its statement to be false or to have made the statement in reckless disregard of the truth."[167] In contrast to common law fraud, however, "equitable fraud can only be applied in those cases in which one of the two fundamental sources of equity jurisdiction exist: (1) an equitable right founded upon a special relationship over which equity takes jurisdiction, or (2) where equity affords its special remedies, *e.g.*, 'rescission, or cancellation; where it is sought to reform a contract . . . or to have a constructive trust decreed.'"[168]

Zutrau alleges that Jansing committed equitable fraud by making false promises to her in conversations between the two in 2001, when he offered her equity in ICE, and in 2004, around the time she received that equity. According to Zutrau, in 2001, Jansing promised her that if she would dedicate herself to rehabilitating the Company until it was profitable and could be sold, he would grant her equity and, together, the parties would: (1) benefit from their efforts in line with the success of the Company; and (2) remain stockholders of the Company until the sale of ICE to a third party, at which point they would share in the sale proceeds according to their respective percentages of equity

---

[166]     *Zirn v. VLI Corp.*, 681 A.2d 1050, 1060 (Del. 1996) (citing *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992)) (emphasis omitted).

[167]     *Id.* (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).

[168]     *U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *26 (Del. Ch. June 6, 1996) (citing 37 Am. Jur. 2d Fraud and Deceit § 220 (1968)).

39

ownership. Jansing allegedly reiterated those two promises in 2004, when Zutrau was granted stock in the Company.

Zutrau avers that those promises were later broken and proven false when Jansing effected the purported Reverse Stock Split in June of 2012 and froze out her shares, because after that she could no longer benefit from the success of the Company through distributions or otherwise and would be unable to share in the proceeds of a sale of the Company to a third party. Zutrau claims that she relied to her detriment on Jansing's false promises by investing herself completely in the Company and foregoing other opportunities. On that basis, she contends that Jansing is liable for equitable fraud for the false promises that he made to her.

Jansing contests the factual underpinnings of Zutrau's equitable fraud claim, denying, for example, that he made the promises that she claims he did. Even if Jansing did make those promises, however, Zutrau has failed to prove a claim of equitable fraud. As an initial matter, Zutrau's fraud claim appears to be an impermissible attempt to "bootstrap" the breach of contract claim she asserted in the New York Action. There, Zutrau alleged that she and Jansing had entered into an oral agreement based on a promise he made to her in 2001, and reiterated in 2004, that he would employ her for as long as she owned stock in ICE.[169] The New York Court ultimately dismissed Zutrau's breach of contract claim based on the integration clause in the RSA.[170] Based on the

---

[169] *Zutrau v. Ice Sys., Inc.*, 2011 WL 5137152, at \*3 (N.Y. Sup. Ct. Oct. 28, 2011).

[170] *Id.* at \*4.

40

timing and nature of the promises that Zutrau challenges in her equitable fraud claim here, it is reasonable to infer that they were part of the same alleged oral agreement that she asserted in the New York Action.[171] The law is clear, however, that a party who has asserted a breach of contract claim may not "bootstrap" that claim into a claim of fraud, merely by asserting that the promises underlying the contract were made fraudulently.[172]

Even if, however, the representations at issue here are treated as distinct from those underlying the breach of contract claim asserted in the New York Action, Zutrau still has failed to prove a claim of equitable fraud. Specifically, Zutrau has failed to prove that Jansing made a false representation that would support a fraud claim because the representations that she challenges were exclusively promises as to future conduct, and Zutrau has neither claimed nor submitted any convincing evidence indicating that Jansing did not intend to perform those promises when they were made.[173]

---

[171] In any event, Zutrau has not asserted a breach of contract claim in this action.

[172] *See Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *6 (Del. Ch. Dec. 21, 1998) ("[A] claim for breach of contract . . . . cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform."). *See also Grunstein v. Silva*, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009); *BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *8 (Del. Ch. Aug. 3, 2004).

[173] For purposes of this analysis, I assume without deciding that Zutrau's equitable fraud claim could qualify as being within one of the two sources of equity jurisdiction discussed *supra* in the text accompanying note 168.

"To support a claim for fraud, the putative misrepresentation must concern either a past or contemporaneous fact or a future event that falsely implies an existing fact."[174] In general, therefore, "statements which are merely promissory in nature and expressions as to what will happen in the future are not actionable as fraud."[175] As an exception to this general rule, Courts have held that an unfulfilled promise of future performance can support a claim for fraud if, "at the time the promise was made, the speaker had no intention of performing."[176] That is because a promise is regarded as a representation of a promisor's intention or state of mind, and a "knowing misrepresentation of one's intention or state of mind is a misrepresentation of an existing fact."[177] Thus, a promisor's intention not to perform at the time a promise is made is a necessary factual predicate to that promise qualifying as a false representation for purposes of fraud. In that regard, I also note that, although scienter is not an element of equitable fraud, a

---

[174] *Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at *7 (Del. Ch. Dec. 23, 2008) (citing *Berdel, Inc. v. Berman Real Estate Mgmt., Inc.*, 1997 WL 793088, at *8 (Del. Ch. Dec. 15, 1997)).

[175] *Grunstein*, 2009 WL 4698541, at *13 (quoting *Outdoor Techs., Inc. v. Allfirst Fin., Inc.*, 2001 WL 541472, at *4 (Del. Super. Apr. 12, 2001)) (internal quotation marks omitted).

[176] *Id.* (citing *Winner Acceptance Corp.*, 2008 WL 5352063, at *7).

[177] *Id.* (quoting *Stevanov v. O'Connor*, 2009 WL 1059640, at *12 n.66 (Del. Ch. Apr. 21, 2009)).

plaintiff alleging equitable fraud nonetheless bears the burden of demonstrating that the defendant made an actionable false representation.[178]

Here, there can be no genuine dispute that the representations Zutrau cites in support of her equitable fraud claim were promises of future conduct. Indeed, in her own post-trial briefing, Zutrau characterizes those representations as promises.[179] Moreover, the promises related to future conduct by Jansing because, according to Zutrau, they represented commitments by him to share the success of the Company with her over time and to allow her to remain an ICE stockholder until the Company could be sold to a third party at some future date. Thus, in order for those promises to qualify as false representations for purposes of fraud, including equitable fraud, Jansing must have made those promises with the contemporaneous intent not to perform them.

Zutrau, however, adduced no evidence that Jansing did not intend to keep the disputed promises at the time that he made them. Indeed, when she was asked about this subject at trial, Zutrau admitted that she was not claiming that Jansing never intended to keep his alleged promises and that she did not see evidence of an intent by him to break

---

[178] *Cf. Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at *9 n.56 (Del. Ch. Dec. 23, 2008) (Court's holding dealt only with a common law fraud claim).

[179] *See* Pl.'s Opening Br. 50 ("Jansing committed equitable fraud by falsely *promising* Ms. Zutrau that the parties would jointly (i) benefit from ICE's success through distributions from its revenue stream once it became profitable, and (ii) remain stockholders of the company until the sale of ICE to a third party . . . .") (emphasis added).

43

those promises until after her termination.[180] Moreover, the evidence of Jansing's conduct before he terminated Zutrau comports with an original intent by Jansing to keep the alleged promises. In that regard, I note that between 2001 and 2007, Jansing granted Zutrau equity, paid her a generous and steadily increasing salary, and promoted her on several occasions. Although Zutrau claims that Jansing ultimately violated the alleged promises by executing the Reverse Stock Split, "a party's failure to keep a promise does not prove the promise was false when made."[181]

Thus, Zutrau has failed to prove that when Jansing made the promises she challenges as fraudulent, he intended not to keep those promises. The alleged promises, therefore, are not actionable false representations for purposes of fraud. On that basis, I find in favor of Jansing and against Zutrau on her claim for equitable fraud.

### B. Standards Applicable to Breach of Fiduciary Duty Claims

Zutrau has asserted both direct and derivative breach of fiduciary duty claims against Jansing, as ICE's sole director. The starting point in analyzing breach of fiduciary duty claims "is with the well-established presumption of the business judgment rule, which reflects and promotes the role of the board of directors, and not the Court, as the appropriate body to manage the business and affairs of the corporation."[182] The business judgment rule "is a presumption that in making a business decision the directors

---

[180] Tr. 178-79 (Zutrau).

[181] *Grunstein*, 2009 WL 4698541, at *13 (quoting *Berdel, Inc. v. Berman Real Estate Mgmt., Inc.*, 1997 WL 793088, at *8 (Del. Ch. Dec. 15, 1997)).

[182] *Wayne Cty. Employees' Ret. Sys. v. Corti*, 2009 WL 2219260, at *10 (Del. Ch. July 24, 2009), *aff'd*, 996 A.2d 795 (Del. 2010) (citing 8 *Del. C.* § 141(a)).

44

of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[183] Where the business judgment presumption is applicable, a director-approved decision will be upheld unless it cannot be "attributed to any rational business purpose."[184] The burden is on the plaintiff to establish facts rebutting the presumption by "showing that the board breached either its fiduciary duty of due care or its fiduciary duty of loyalty."[185] If that showing is made, then the burden shifts to the defendant "to demonstrate that the transaction complained of was entirely fair to the stockholders."[186]

The fiduciary duty of care is a process-oriented duty that requires the directors of a Delaware corporation to "consider all material information reasonably available in making business decisions."[187] Duty of care violations are actionable only if the directors acted with gross negligence, which is "conduct that constitutes reckless indifference or actions that are without the bounds of reason."[188]

---

[183] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

[184] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

[185] *Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007).

[186] *Williams v. Geier*, 671 A.2d 1368, 1378 (Del. 1996).

[187] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 747 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (quoting *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000)) (internal quotation marks omitted).

[188] *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008).

The fiduciary duty of loyalty, in essence, "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[189] Classic examples that implicate the duty of loyalty are "when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders."[190] The duty of loyalty also precludes directors from acting in bad faith, which may be shown, among other examples that might be cited, "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[191]

If a plaintiff fails to rebut the business judgment presumption by showing a breach of the duties of care or loyalty, she will not be entitled to any remedy unless the challenged transaction constitutes waste.[192] To recover on a claim of waste, a plaintiff must prove that the relevant exchange was "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate

---

189 *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

190 *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d at 749 (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d at 362).

191 *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006) (citing *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006)).

192 *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d at 73-74 (citing *In re J.P. Stevens & Co. S'holders Litig.*, 542 A.2d 770, 780 (Del. Ch. 1988)).

consideration."[193]  Thus, a claim of waste will lie "only in the rare, unconscionable case where directors irrationally squander or give away corporate assets."[194]

I also note that ICE's COI includes an exculpatory provision adopted pursuant to 8 *Del. C.* § 102(b)(7).  Such a provision prohibits the recovery of monetary damages from directors for a successful shareholder claim that is based solely upon establishing a violation of the duty of care.[195]  A provision adopted under Section 102(b)(7) does not, however, eliminate a director's fiduciary duty of care, as a court still may grant injunctive relief for a violation of that duty.[196]

## C.    Derivative Claims for Breach of Fiduciary Duty

In her derivative claims against Jansing for breach of his fiduciary duties, Zutrau challenges a wide array of decisions he made and actions he took while running the Company after her termination.  As a threshold matter, I note that one possible consequence of the Reverse Stock Split, assuming it was valid, would be that Zutrau technically would lack standing to bring her derivative claims on behalf of ICE because she no longer would qualify as an ICE stockholder.[197]  Under those circumstances,

---

[193]    *Id.* (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)) (internal quotations omitted).

[194]    *Id.*

[195]    *Emerald P'rs v. Berlin*, 787 A.2d 85, 91 (Del. 2001).

[196]    *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 752 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del. 2001)).

[197]    *See* 8 *Del. C.* § 327; Ct. Ch. R. 23.1; *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 935 (Del. Ch. 2008) ("a plaintiff, bringing a derivative suit on

however, the derivative claims would qualify as corporate assets which would be relevant to determining the fair value of Zutrau's shares at the time of the Reverse Stock Split.[198] In addition to challenging the validity of the Reverse Stock Split, Zutrau questions, in the alternative, the adequacy of the consideration she received in the Reverse Stock Split.

Zutrau's standing to pursue her derivative claims, however, is not at issue in this case. Jansing has waived any objection to Zutrau litigating her derivative claims in the context of valuing her interest in ICE in connection with the Reverse Stock Split.[199] Thus, Jansing's liability for any derivative claims that existed at the time of the Reverse Stock Split will be relevant to assessing the damages in this action, whether or not the Reverse Stock Split ultimately is upheld as a valid corporate action. On that premise, I next evaluate the merits of the derivative claims Zutrau has asserted against Jansing.

Zutrau's derivative breach of fiduciary duty claims fall into several different categories. Specifically, Zutrau alleges that Jansing breached his fiduciary duties by engaging in the following five categories of misconduct: (1) failing to replace Zutrau

---

behalf of a corporation, must be a stockholder of the corporation at the time he commences the suit and must maintain that status throughout the course of the litigation.") (quoting *Heit v. Tenneco, Inc.*, 319 F. Supp. 884, 886 (D. Del. 1970)) (internal quotation marks omitted); *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984) ("A plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit.").

[198] *See Bomarko, Inc. v. Int'l Telecharge, Inc.*, 1994 WL 198726, at *3 (Del. Ch. May 16, 1994) (holding, in the appraisal context, that derivative "breach of fiduciary duty claims . . . are corporate assets that may be included in the determination of fair value.") (citing *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1142-44 (Del. 1989)).

[199] Def.'s Opening Post-trial Br. 58.

with anyone who could provide competent financial oversight of the Company; (2) paying himself unreasonable compensation; (3) causing ICE to pay for his personal expenditures; (4) paying unreasonable compensation, fringe benefits, and remuneration to ICE employees; and (5) wasting ICE's assets. I address these claims in approximately reverse order. First, I examine the fourth and fifth categories of alleged misconduct, for which Zutrau does not allege direct self-dealing by Jansing. Then, I turn to the second and third categories of alleged misconduct, which do involve self-dealing by Jansing. Finally, I address the first category of alleged wrongdoing. Central to the latter claim is Zutrau's assertion that Jansing terminated her and failed to appoint an adequate replacement in order to facilitate all of his other breaches of fiduciary duty. Because that claim depends to some extent on the strength of her more specific claims, I find it helpful to consider it last.

### 1. Zutrau's claim that Jansing paid unreasonable compensation to ICE employees

Zutrau alleges that Jansing breached his fiduciary duties by paying unreasonable compensation to ICE employees following her termination. Among other things, she complains that Jansing began paying larger salaries and bonuses to certain employees. Zutrau's former co-worker, Berg, who received a bonus of $7,500 in 2006,[200] began receiving larger annual bonuses thereafter including a bonus of $30,000 in 2011.[201] In addition, after Zutrau's termination, Henriksen and one other ICE employee who

---

[200]    JX 329 at ICE010119.

[201]    JX 409.

previously had received only minor bonuses began receiving annual bonuses in the range of $20,000-$25,000.[202] Zutrau also complains that ICE has no formal policy on employee bonuses and that Jansing determines bonus awards solely through the exercise of his discretion.

In addition to challenging employee bonuses, Zutrau disputes various fringe benefits that Jansing has awarded to ICE employees. In that regard, Zutrau objects to ICE's payment of vehicle expenses for Lotspeich and another sales employee,[203] as well as social club expenses for Lotspeich.[204] Zutrau also complains that Jansing has caused ICE to award employees holiday gifts that have included $500 gift cards and i-Pads.[205] In general, she argues that Jansing's lavish and excessive spending on Company employees for increases in ICE's payroll and fringe expenses have caused ICE's bottom line to suffer.[206] Similarly, to the extent that ICE's increased fringe expenses are due to increased healthcare costs, Zutrau contends Jansing should have reduced the healthcare coverage that ICE offers its employees.

---

[202]  *Compare* JX 329 at ICE010126, *with* JX 409.

[203]  Jansing Del. Dep. 141-43.

[204]  Jansing N.Y. Dep., vol. 2, 412-13; JX 372.

[205]  Henriksen Del. Dep. 101-02; Pollino Del. Dep. 28-30.

[206]  Zutrau also has alleged that certain of the perks and benefits given to ICE employees were not accounted for properly for tax purposes. Pl.'s Opening Br. 24-25, 40-41. Zutrau did not provide any expert testimony or cite to any tax laws or regulations in support of that argument, however. Thus, I reject Zutrau's allegation that the disputed tax treatment was improper for lack of proof.

As the sole director of ICE, Jansing's decisions regarding what level of compensation and benefits to provide to ICE employees are entitled to the presumption of the business judgment rule. Thus, Zutrau bears the burden of demonstrating that Jansing's decisions breached his fiduciary duties of loyalty or care, or constituted waste. She has failed to do so.

As to the duty of loyalty, Zutrau argues that Jansing's decisions regarding employee compensation were made in bad faith and were indirectly self-interested. She alleges that Jansing intentionally overpaid ICE employees in order to deprive Zutrau of any return on her investment, ostensibly so that she would be forced to sell her shares to him at an unfair price.[207] The only evidence that Zutrau offers to support this theory is her testimony that, in the past, Jansing had interfered with her negotiations with Computershare and offered her a lowball price of $150,000 for her shares, which Jansing denies. Even if I accept Zutrau's testimony on the Computershare negotiations, however, it is insufficient to support her theory that Jansing intentionally overpaid ICE employees to deprive her of a return. At the time of the challenged compensation decisions, Jansing was the majority stockholder of ICE, owning 78% of its shares compared to Zutrau's 22% equity stake. Thus, any unnecessary reduction in ICE's profits would have

---

[207] At various points in her testimony and in her post-trial briefs, Zutrau also insinuates that Jansing may have overpaid ICE employees in order to elicit favorable testimony from them in the New York Action. Tr. 319-20 (Zutrau); Pl.'s Opening Br. 26. In support of this accusation, Zutrau cites only the fact that ICE's overall payroll and fringe expenses increased during the same timeframe as the New York Action. This minimal evidence, however, fails to support a reasonable inference that Jansing acted for the purposes Zutrau alleges.

negatively impacted Jansing's return, and the value of his stake in the Company, nearly four times as much as it would Zutrau's. Under these circumstances, I find that, more likely than not, Jansing would not intentionally have overpaid ICE employees in order to diminish the value of the Company and place additional pressure on Zutrau to sell her shares. Thus, Zutrau has failed to demonstrate that Jansing's employee compensation decisions were a breach of his duty of loyalty.

Regarding the duty of care, the only legally cognizable claim that Zutrau asserted with respect to Jansing's employee compensation decisions challenged his process for determining employee bonuses.[208] Jansing described the criteria he used to determine whether to give employee bonuses as including: "[p]erformance; attitude; behavior; contributions . . . on a professional level, on a business level. You know, just generally their contribution from a performance standpoint."[209] When asked how he measured performance, and whether he relied on any objective factors to do so, Jansing answered: "[n]o, there are no real – there's no policy, and I don't have anything written, . . . it's just generally I go from year to year. And I look back on the year and make a determination based on what's transpired and work off that."[210] Zutrau asserts that the relatively

---

[208] Zutrau generally averred that the level of compensation and benefits Jansing provided to ICE employees was excessive and not in the economic best interests of the Company. As this Court previously has noted, however, "merely alleging that Defendants made poor business decisions does not rebut the business judgment rule or state a claim for breach of the duty of care." *TVI Corp. v. Gallagher*, 2013 WL 5809271, at *13 (Del. Ch. Oct. 28, 2013).

[209] Jansing Del. Dep. 164.

[210] *Id.*

52

imprecise and subjective process Jansing used for making bonus determinations and the lack of a formal policy amounted to a breach of his duty of care.

As previously noted, to demonstrate a breach of the duty of care, a plaintiff must demonstrate that a director defendant was grossly negligent in, for example, failing to inform himself of reasonably available material information before making a challenged corporate decision. Delaware courts have long recognized that there is "no single blueprint"[211] for satisfying the duty of care and that "[e]xactly what the law requires varies according to the nature and importance of the considered transaction."[212] For a micro-cap company such as ICE, which employs only thirteen people, I do not consider it unreasonable, and certainly not grossly negligent, for the chief executive to base annual employee bonuses upon his qualitative assessment of each employee's performance, attitude, behavior, and professional contributions for the preceding year. The mere lack of a formal written policy does not render such a decision-making process unreasonable. For these reasons, Zutrau has failed to prove her claim that Jansing breached his fiduciary duty of care in connection with awarding employee bonuses after Zutrau was terminated.

Finally, I hold that Zutrau has not shown that the compensation and benefits Jansing awarded to ICE employees constituted corporate waste. There was a significant increase in aggregate payroll and fringe benefit expenses at ICE between 2006 and 2012,

---

[211] *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del. 1989).

[212] *Blackmore P'rs, L.P. v. Link Energy LLC*, 2005 WL 2709639, at *8 (Del. Ch. Oct. 14, 2005) (citing *Citron v. Steego Corp.*, 1988 WL 94738 (Del. Ch. Sept. 9, 1988)).

although the precise magnitude of that increase is disputed. Jansing credibly testified, however, that a significant portion of that increase was due to the addition of new staff and increasing healthcare costs. Those types of standard operating costs associated with running a business almost by definition do not qualify as waste. Nevertheless, Zutrau also complains about specific examples of what she considers to be lavish and excessive spending, including ICE making employee vehicle payments, paying employee social club dues, and giving employees holiday gifts. But, each of these categories of expenditures can be attributed to a rational business purpose, including, respectively, enabling ICE salespeople to travel to conferences and visit prospective clients, providing an environment for ICE salespeople to meet with prospective clients, and improving employee morale and loyalty. None of these expenditures comes close to qualifying as "irrationally squander[ing] or giv[ing] away corporate assets,"[213] as would be required to establish a claim for waste.

Thus, Zutrau has failed to prove that Jansing's decisions regarding employee compensation breached his fiduciary duties. I next consider Zutrau's claim that Jansing wasted ICE's corporate assets through various other, non-compensation related expenditures.

### 2. Zutrau's claim that Jansing wasted ICE's corporate assets

As previously noted, the traditional test for waste is whether the disputed exchange was "so one sided that no business person of ordinary, sound judgment could

---

[213] *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000).

conclude that the corporation has received adequate consideration."[214]  This stringent standard "is a corollary of the proposition that where business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be 'attributed to any rational business purpose.'"[215]

Zutrau challenges as wasteful numerous actions and decisions Jansing made while running the Company from 2007 to 2012.  Among other things, Zutrau takes issue with Jansing's decision to upgrade ICE's Sage accounting software, his making of a loan on behalf of ICE to a business acquaintance, his alleged overpayment of vendors, and other miscellaneous expenditures that he caused ICE to incur.  None of these criticisms suffices to prove a waste claim.

In 2007, after the Company had experienced several technical malfunctions related to its Sage accounting software, Jansing, on the advice of outside consultants, caused ICE to pay for the system to be upgraded.  The upgrades and related training cost the Company approximately $60,000.[216]  Zutrau alleges that she was able to use the software effectively before the upgrades and that acquiring them was a waste of ICE's corporate assets.[217]  Because the record shows that ICE experienced disruptive malfunctions of the Sage system, including some during Zutrau's tenure and that Jansing relied on an outside

---

[214]   *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (quoting *Brehm v. Eisner*, 746 A.2d at 263) (internal quotation marks omitted).

[215]   *Id.* (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

[216]   Tr. 532 (Jansing).

[217]   Tr. 102-05 (Zutrau).

55

consultant in responding to those problems, I find that the upgrades had a rational business purpose and do not constitute waste.

As to the loan made on behalf of ICE to a business acquaintance, sometime in 2009, Jansing made a phone call to Ray Unger, the President of Accutech, an ICE business partner. In that phone call, Unger revealed that he did not expect his company to be able to make payroll the following day.[218] Jansing responded by offering Unger a loan from ICE, which Unger accepted. The loan, executed that day, was for $200,000; it was unsecured and had no specified repayment date.[219] Zutrau challenges the loan as irrational and a waste of ICE's resources. The loan, however, was repaid with interest. Moreover, Jansing credibly testified that part of his reason for making the loan was his concern that if Accutech failed, it would negatively impact ICE's business.[220] In those circumstances, I find that the loan was not so one-sided as to be irrational, and did not amount to waste.

Zutrau also claims that Jansing wastefully caused ICE to overpay certain vendors. Specifically, she asserts that he over-estimated amounts owing to a firm known as Infovisa, and caused ICE to pay them $32,000 instead of $23,000, an alleged overpayment of $9,000. She also avers that, in 2009, Jansing caused ICE to overpay vendor Commerce Clearing House ("CCH") by $57,000, paying more than double what

---

[218]   Tr. 540 (Jansing).

[219]   *Id.* at 541-42.

[220]   *Id.* at 542.

contractually was required. Zutrau, however, has offered no competent evidence in support of her allegations that these expenditures meet the stringent test for waste. As to Infovisa, she merely has compared the amounts that company charged during her tenure at ICE with what it charged in later years. For her claim that Jansing overpaid CCH, Zutrau relies almost exclusively on her own deposition testimony.[221] Jansing offered undisputed testimony that ICE needed to increase the services it obtained from vendors such as CCH sometime after Zutrau left to meet competition from Broadridge.[222] Zutrau asserts that, even so, ICE was overpaying for CCH's services. But, that allegation is insufficient to support a waste claim for which a claimant must show that virtually no consideration was received in the relevant exchange. Thus, Zutrau failed to establish waste as to Jansing's alleged overpayment of vendors.

Finally, Zutrau challenges as wasteful a large number of miscellaneous expenditures, including, but not limited to, spending on company outings for ICE employees, office supplies, and an apparently large supply of gummy bear snacks for the office. Having reviewed the record and considered the briefing and arguments of both sides, I conclude that none of Zutrau's complaints about these miscellaneous expenditures provide a basis for a finding of waste.

---

[221] *See* Pl.'s Opening Br. 24. In the circumstances of Zutrau's limited knowledge as to the rationale for payments after her termination, the value of her testimony on this issue is limited.

[222] *See* Tr. 452-54.

### 3. Zutrau's claim that Jansing paid himself unreasonable compensation

Zutrau alleges that Jansing also breached his fiduciary duties by paying himself unreasonable bonuses from ICE during the six years from 2007 to 2012. It is uncontested that, during that timeframe, Jansing was responsible for determining his own compensation at ICE, as he had been before Zutrau's termination. In each of the years in question, Jansing earned a base salary of $200,000. He also awarded himself a bonus of over $100,000 in five of those years. Specifically, the bonus income Jansing received from ICE is as follows: $432,000 in 2007; no bonus in 2008; $275,000 in 2009; $172,000 in 2010; $272,866 in 2011; and $180,172 in 2012. Thus, from 2007 to 2012, Jansing received, in the aggregate, approximately $1.3 million in bonus compensation. His total compensation from both salary and bonuses was approximately $2.5 million during that period.

"Like any other interested transaction, directoral self-compensation decisions lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation."[223] Thus, "self-interested compensation decisions made without independent protections are subject to the same entire fairness review as any other interested transaction."[224] Under this heightened

---

[223] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 265 (Del. 2002).

[224] *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 745 (Del. Ch. 2007).

standard of review, the defendant must demonstrate to the court's satisfaction and subject to its exacting scrutiny that the challenged transaction is entirely fair to stockholders.[225]

The concept of entire fairness has two basic components: fair dealing and fair price.[226] Fair dealing "concerns how the board action was initiated, structured, negotiated, and timed."[227] Fair price "relates to the economic and financial considerations of the [transaction.]"[228] The two aspects of entire fairness are not independent, however. Rather, "the fair dealing prong informs the court as to the fairness of the price obtained through the process. The court does not focus on the components individually, but determines the entire fairness based on all aspects of the entire transaction."[229]

### a. Fair dealing

The only record evidence on the process utilized by Jansing to award himself bonuses are his answers to a handful of questions posed at depositions in the New York Action and in this action. Based on that limited evidence, Jansing has failed to demonstrate that he undertook any meaningful process to ensure that the amount of his bonus awards would be reasonable and fair to the Company or its minority stockholder.

---

[225] *See Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 42 n.9 (Del. 1994); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[226] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[227] *In re Digex Inc. S'holders Litig.*, 789 A.2d 1176, 1207 (Del. Ch. 2000).

[228] *Weinberger v. UOP, Inc.*, 457 A.2d at 711.

[229] *Valeant Pharm. Int'l v. Jerney*, 921 A.2d at 746.

59

On March 21, 2011, in his deposition in the New York Action, Jansing was asked how he determined his annual bonus for 2010. He answered as follows:

> [T]he way that we do our year end financial management . . . is we try to pay as many bills as we can, try to clear up as much as we possibly can, get as much money as we possibly can, pay bonuses to employees, try to legitimately come up with expenses for the business, and after that, if there's money left over, . . . I will take a bonus. So I wait until everything else is accomplished until I determine what my bonus is.[230]

When Jansing was pressed further on how he determined the amount of any bonus he received, he replied "I just take whatever is . . . appropriate at that point. *There is no real formula or process*."[231]

On April 29, 2013, in Jansing's deposition in this action, the following exchange occurred during questioning as to his 2012 bonus:

> Q. Do you think it's appropriate to give yourself a six-figure bonus when ICE lost money?
>
> A. Yes.
>
> Q. Why?
>
> A. I thought we did a great job as a company, and I was responsible for its operations. And this was all during a time when we were going through litigation and were distracted, and we still managed to do a lot of good things. And, you know, as far as – you're asking me about my bonus and employees' bonuses or just mine?
>
> Q. Just right now asking about yours.

---

[230]   Jansing N.Y. Dep. 317.

[231]   *Id.* at 318 (emphasis added).

A.    Okay. If I could have, I would have paid myself more.

Q.    Why didn't you?

A.    I just decided that was the amount that I would take. Whatever that amount was.[232]

Jansing has submitted no evidence of any independent review of his bonus determinations, and has not identified any objective criteria, formula, or procedure used to ensure that the amount of his bonuses was reasonable. Rather, his statements under oath indicate that he merely waited to see if the Company had cash left over at the end of the year, without regard to whether the Company had turned a profit or to the rights of the minority stockholder, Zutrau, and, if there was cash left over, he would award himself some discretionary amount as a bonus, on a seemingly arbitrary basis. The process that Jansing employed lacks any semblance of fairness.

In defense of his method for determining his bonuses, Jansing makes two arguments, neither of which is persuasive. First, Jansing asserts that it would be unreasonable to expect a Company with ICE's size and ownership structure to use an independent compensation committee. Second, Jansing contends that the procedural fairness of his bonus determinations for the years in question is supported by the fact he never has had a formal process for determining the amount of his bonuses, including during Zutrau's tenure with the Company.

The first argument is a red herring. Even if it would be unreasonable to expect a Company such as ICE to use an independent compensation committee, that would not

---

[232]    Jansing Del. Dep. 196-97.

excuse Jansing's complete and total failure to adopt *any* meaningful procedure for ensuring that his self-interested bonus awards were fair to ICE and its minority stockholder. Jansing's second argument is equally unavailing. A wholly unconstrained process for executing self-interested transactions does not amount to fair dealing simply because it comports with a defendant's past practices.

For all of these reasons, I conclude that Jansing's bonus awards were not the result of an adequate and fair process.

### b. Fair price

Having concluded that Jansing's bonuses during the 2007-2012 timeframe were the product of an unfair process, I proceed to consider whether the amount of those bonuses was fair. As this Court previously has noted:

> The court's finding that . . . [an interested] board used an unfair process to authorize the bonuses does not end the court's inquiry because it is possible that the pricing terms were so fair as to render the transaction entirely fair. Nevertheless, where the pricing terms of a transaction that is the product of an unfair process cannot be justified by reference to reliable markets or by comparison to substantial and dependable precedent transactions, the burden of persuading the court of the fairness of the terms will be exceptionally difficult. Relatedly, where an entire fairness review is required in such a case of pricing terms that, if negotiated and approved at arm's-length, would involve a broad exercise of discretion or judgment by the directors, common sense suggests that proof of fair price will generally require a showing that the terms of the transaction fit comfortably within the narrow range of that discretion, not at its outer boundaries.[233]

---

[233] *Valeant Pharm. Int'l v. Jerney*, 921 A.2d at 748-49.

Among the factors a Court may consider in determining whether salary is reasonable are whether it bears a reasonable relation to salary received in the past and how the amount of the challenged salary compares to other salaries paid by the employer.[234] Thus, I consider the amount of salary and bonuses that Jansing and Zutrau received in the three years preceding Zutrau's termination to be a useful starting point in this analysis.

During those three years, Jansing was the President and sole director of ICE and Zutrau was its Treasurer and Vice President. As President, Jansing ultimately was responsible for all of ICE's major operational decisions and effectively acted as the Company's CEO. Jansing received a base salary of $200,000 in each of the three years from 2004 to 2006.[235] Zutrau's annual salary was $140,000 in 2004 and 2005, and $180,000 in 2006.[236] As for bonuses, in 2004, bonuses of $120,000 were awarded to Jansing and Zutrau; in 2005, Jansing received no bonus and Zutrau received $100,000; and in 2006, Jansing and Zutrau received bonuses of $378,000 and $211,000, respectively.[237] Thus, in the three years preceding Zutrau's termination, substantial

---

[234] *Wilderman v. Wilderman*, 315 A.2d 610, 615 (Del. Ch. 1974).

[235] JX 518.

[236] *Id.*

[237] *Id.* Although the sums of $378,000 and $211,000 were paid as bonuses through payroll to Jansing and Zutrau, respectively, in 2007, Zutrau maintains that only she received a bonus that year. Specifically, she claims that $100,000 of the amount she received was actually a bonus, and that the remaining amounts that were paid to herself and Jansing were actually disguised shareholder distributions, awarded to them to cover their shareholder tax liability and issued through payroll

bonuses had been awarded to ICE's officers, with Jansing and Zutrau each receiving average bonuses of approximately $166,000 and $144,000, respectively. As Jansing's bonuses were only slightly larger than Zutrau's in those three years, despite his more senior position, I consider those bonus awards to be presumptively fair. The average size of Jansing's annual bonus in the six years from 2007-2012, however, was approximately $222,000, significantly larger than his previous bonuses. Moreover, even if the size of Jansing's average annual bonus had not increased after Zutrau's termination, Jansing still would bear the burden of proving that the same level of bonus compensation was justified and entirely fair in those later years.

---

so they could be written off by ICE as compensation expenses. *See* Tr. 54-55. I reject this argument as barred by collateral estoppel or issue preclusion.

Zutrau made precisely this same argument to the New York Court. She claimed that the bonuses Jansing awarded himself from 2007-2012 were also disguised shareholder distributions, in which she was entitled to share on a *pro rata* basis. JX 439 at 32-33. In rejecting that claim, the New York Court held as follows: "Maurice Kalaygian, Jansing's personal accountant and a CPA, testified that it is not an acceptable accounting practice to make shareholder distributions through payroll. He also testified that ICE paid shareholder distributions in 2010 and 2011, but not before 2010. The court credits Kalaygian's testimony over contradictory testimony by [Zutrau], who is not an accountant and has no formal training in accounting. Moreover, the documentary evidence supports the defendants' view that the bonuses were not shareholder distributions." *Zutrau v. Ice Sys., Inc.*, 2013 WL 1189213, at *8 (N.Y. Sup. Ct. Mar. 20, 2013). I therefore consider this factual issue to have been resolved conclusively in the New York Action and I will not revisit that issue here. *See Sanders v. Malik*, 711 A.2d 32, 33 (Del. 1998) ("The doctrine of collateral estoppel essentially prohibits a party who has litigated one cause of action from relitigating in a second cause of action matters of fact that were, or necessarily must have been, determined in the first action.").

Jansing, who has remained ICE's President and sole director throughout the relevant time period, has not identified any change in his business responsibilities at ICE that would justify an increase in his compensation. Rather, to support the fairness of the amount of his bonus awards, Jansing relies almost exclusively on the report and testimony of his expert witness on compensation, Priya Kapila, who conducted a market-based assessment of Jansing's compensation levels.[238]

To determine what level of compensation would be reasonable for Jansing, Kapila first compared ICE's financial performance (as a proxy for Jansing's performance as President) with the financial performance of a peer group of six companies (the "Peer Group").[239] The companies in the Peer Group are similar in size to ICE (reporting one-half to two times ICE's annual revenues) and their operations include data processing services (defined by having a Standard Industry Classification ("SIC") code of 7374, as does ICE).[240] Kapila concluded that ICE performed in the 90th percentile compared to the Peer Group in the first three years under consideration (2007-2009), and in the 50th percentile in the last three years (2010-2012).[241] Using those percentiles, Kapila then compared Jansing's total compensation for each year, including total cash compensation (*i.e.*, salary and bonuses), long-term incentives, and "perks," to market compensation

---

[238]    *See* Tr. 758-83; JX 509.

[239]    Tr. 759-61; JX 509 at 4-7.

[240]    JX 509 at 4-7.

[241]    *Id.*

survey data for CEOs. She collected the market data from five different sources.[242] Assuming that Jansing received perks of approximately $3,000 per year, Kapila concluded that his aggregate total compensation for the six years in question, which she calculated to be $2,550,038, was reasonable under the circumstances and could have been higher by $248,503 and still been reasonable.[243]

Zutrau presented the report and testimony of a rebuttal expert on compensation, Thomas Tilghman. Tilghman highlighted a number of problems with Kapila's analysis that he contends render unreliable her conclusion that Jansing's compensation during the relevant period was reasonable.[244] Most significantly, Tilghman identified problems with the Peer Group and with the survey compensation data utilized by Kapila in her report.

As to the Peer Group, Tilghman asserted that six companies is significantly below the number that typically is recommended for a peer group analysis and opined that it is not a sufficient sample size to make meaningful comparisons to ICE.[245] At trial, Kapila conceded that WorldatWork, the professional organization of compensation experts that sets guidelines for compensation analyses, suggests that a peer group survey should include at least twelve or more companies.[246] Tilghman also observed that, although the companies in the Peer Group use the same SIC code in government reporting as ICE

---

[242]    Tr. 761-63; JX 509 at 7-13.

[243]    JX 509 at 7-13.

[244]    *See* Tr. 784-90; JX 510.

[245]    JX 510 at 6.

[246]    Tr. 777.

does, they do not appear to be genuinely comparable.[247]  In that regard, public filings of the companies in the Peer Group indicate that only one of them provides proxy services, while three are in the business of credit card or other payment processing and two operate in the healthcare industry.[248]  Finally, the overall performance of the supposedly comparable companies was markedly poor for the years in question, with at least half of the companies having had negative income in each year and with even the 75th percentile income levels being negative in three of the six years.[249]

Based on the Peer Group's small sample size, lack of comparability with ICE, and notably poor performance during the relevant timeframe, I find that the Peer Group does not provide an effective gauge of ICE's performance for the years in question.  Yet, Kapila used the Peer Group to justify her conclusion that Jansing was entitled to receive compensation in the 90th percentile for three of the six years she analyzed.  If the Peer Group benchmarks are disregarded and Jansing's compensation is compared instead to, for example, the 50th percentile of the compensation survey data, his compensation appears to have been unreasonable.[250]  Specifically, assuming Jansing was entitled to the 50th percentile compensation levels that Kapila included in her report, reasonable

---

[247]    JX 510 at 6.

[248]    *See id.* Ex. 4.

[249]    *See* JX 509 at 5-7.

[250]    *See id.* at 11-12.

aggregate compensation for Jansing for the years from 2007-2012 would be $2,057,983.

That would imply that Jansing overpaid himself by approximately $500,000.[251]

In addition to identifying problems with the Peer Group, Tilghman objected to Kapila's use of broad based compensation surveys to derive reasonable compensation figures for Jansing.[252] In that regard, Tilghman noted that at least two of the five survey sources relied upon by Kapila collect information primarily from publically traded companies that are substantially larger than ICE.[253] The category comprised of the smallest companies for which one of those sources collects information consists of companies earning under $1 billion or employing fewer than 1,000 full time employees—revenue and employment statistics that dwarf ICE's.[254] Although Kapila attempted to fit the data she collected to a company of ICE's size through regression calculations, Tilghman credibly averred that such calculations can lead to skewed results for companies whose size is far different from the mean for the relevant data sample.[255] Tilghman also asserted that the industry classifications for several of the survey sources, including classifications such as "professional services" or "services," were too broad to

---

[251]    *Id.*

[252]    Tr. 787-89; JX 510 at 4-6.

[253]    JX 510 at 5.

[254]    *Id.*

[255]    *Id.* The highest annual revenue ICE achieved in the 2007-2012 period was approximately $3.7 million. *See* JX 500 Schedule 3b. Similarly, the most employees ICE had in that timeframe was thirteen. Tr. 449 (Jansing).

reflect accurately the niche industry within which ICE operates.[256] I found Tilghman to be a competent and reliable witness and agree that the considerations he identified limit the probative value of the compensation statistics upon which Kapila relied.

For the foregoing reasons, I conclude that Jansing failed to prove that the bonus compensation he received from 2007-2012 was at a fair price to the Company.

### c. Jansing's bonuses were not entirely fair

Because Jansing's bonus awards from 2007-2012 were the result of an unfair process and Jansing failed to prove the fairness of the amount of those bonuses, I hold that those bonuses were not entirely fair and that Jansing's payment of those bonuses to himself constituted a breach of his duty of loyalty. The remaining question, therefore, is what remedy to provide for that breach. "When a transaction does not meet the entire fairness standard, the Court of Chancery may fashion any form of equitable and monetary relief as may be appropriate."[257] Although rescission frequently is granted where self-dealing transactions are found not to be entirely fair, "where an officer-director has fixed his or her own compensation, our courts have recognized a right to recover under a theory of quantum meruit."[258]

Although Jansing failed to demonstrate that the full amount of the bonuses he awarded himself from 2007 to 2012 was reasonable, I recognize that, before Zutrau's

---

[256] Tr. 788; JX 510 at 5.

[257] *Julian v. E. States Const. Serv., Inc.*, 2008 WL 2673300, at *19 (Del. Ch. July 8, 2008).

[258] *Technicorp Int'l II, Inc. v. Johnston*, 1997 WL 538671 (Del. Ch. Aug. 25, 1997); *see also Wilderman v. Wilderman*, 315 A.2d 610, 614-16 (Del. Ch. 1974).

termination, Jansing and Zutrau both received bonuses that constituted a significant portion of their total compensation as officers. In addition, Jansing has not increased his baseline salary, even for cost of living adjustments, since at least 2004. Overall, however, ICE was not as profitable from 2007 to 2012 as it had been in the preceding three years, due mainly to its mediocre performance since 2010. On the other hand, the Company has increased in size since 2007 and it experienced its most profitable year under Jansing's leadership in 2009. Based on these factors, and in consideration of all of the other facts and circumstances relevant to Jansing's performance, I conclude that Jansing was entitled to receive annual bonus compensation from 2007 to 2012 at approximately 75% of the rate he previously had been receiving, which would equate to about 56% of the rate of bonus compensation that he actually awarded himself from 2007-2012. Thus, for purposes of determining appropriate damages for this claim, I consider it useful to quantify the amount of excess compensation that Jansing received, which would be 44% of the bonus compensation that he awarded himself each year in the 2007-2012 timeframe. The amount of excess compensation year-to-year based on Jansing's bonus compensation, therefore, would be as follows: $190,080 for 2007; $121,000 for 2009; $75,680 for 2010; $120,061.04 for 2011; and $79,275.68 for 2012.[259]

---

[259] For the sake of completeness, I have stated here the putative amount associated with Jansing's excess compensation in 2012. For the reasons stated *infra* in note 363, however, this amount ultimately was not relevant to any remedy the Court is awarding Zutrau.

**4.      Zutrau's claim that Jansing caused ICE to pay for personal expenditures**

Zutrau claims that Jansing breached his fiduciary duties after her termination by causing ICE to pay for various personal expenditures. Most significantly, she alleges that, on numerous occasions, he improperly charged personal expenses to his company-issued American Express ("Amex") card. She also alleges that Jansing improperly caused the Company to pay for several other personal expenses. I first address the claim relating to Jansing's use of his Amex card.

**a.      The personal expenditures Jansing allegedly improperly charged to his Amex card**

Zutrau challenges $50,992.42 in allegedly improper expenses that Jansing charged to his Amex card from 2007 to 2012 (the "Amex charges"), including meal, travel, vehicle, mailing, and other miscellaneous charges, some as low as $5.99.[260] It is undisputed that, both before and after Zutrau's termination, Jansing used his Amex card predominantly to pay for business expenses. The $50,992.42 in expenses that Zutrau challenges are out of a total of over $1 million in expenses that were charged to Jansing's Amex card during the relevant period. Zutrau also complains about Jansing's use of his Amex card's "rewards points" to pay for personal expenditures. Specifically, she alleges that he improperly used 1,391,770 rewards points that, according to Zutrau, have an approximate value of $.01 each, for a total value of $13,917.70.[261]

---

[260]    JX 507 Ex. B.

[261]    Tr. 315.

As to the rewards points, Jansing does not dispute that he redeemed them for personal expenditures. Rather, he avers that his use of the rewards points did not cost the Company any money and should be treated as a *de minimis* perk. Zutrau admits that Jansing's use of the rewards points did not require any cash outlays by the Company.[262] She asserts, however, that they could have been used for other purposes, such as purchasing office supplies.[263] ICE had no formal policy on rewards points,[264] but no evidence has been offered to suggest that Jansing's use of the rewards points was inconsistent with past practices at ICE or with general industry custom. Here, where the alleged market value of the rewards points accumulated on Jansing's Amex card was approximately $2,300 per year, or just over 1% of his base salary of $200,000 (the fairness of which is not disputed), I find Jansing's use of them to be a *de minimis* perk rather than a breach of his fiduciary duties. At trial, Jansing provided uncontroverted testimony that he used rewards points to pay for $5,976.70 of the Amex charges that Zutrau challenges.[265] Thus, the value of the remaining charges for which Jansing could be held liable is $45,015.72.

---

[262]    Tr. 316.

[263]    Tr. 362; *see* Tr. 601 (Jansing).

[264]    Tr. 601 (Jansing).

[265]    *See* Tr. 551-52 (Jansing); Def.'s Demonstrative Ex. ("DDX") 1. Zutrau has objected to DDX 1 and I refer to it only for limited noncontroversial purposes, including to the extent it reflects uncontroverted testimony or admissions by Jansing.

Jansing avers that a substantial majority of the remaining Amex charges were for business expenses, but admits that some were for personal expenses and did not get reimbursed because Jansing considered them to be negligible.[266] In that regard, Jansing admitted that $4,134.26 of the Amex charges were personal, as reflected in a demonstrative that he presented at trial.[267] Jansing also admitted that an additional $5,065.54 of the Amex charges were combined-purpose travel expenses.[268] This category of expenses included travel expenses for trips that Jansing took with his daughter and visits to his relatives, including during the holidays.[269] Although Jansing claims that he also did work on these trips,[270] I find that the charges were predominantly personal expenses for which ICE should not have been charged. Thus, at least $9,199.80 of the Amex charges were for personal expenses.

---

[266]    Tr. 484.

[267]    *See* Tr. 551-53; DDX 1. In DDX 1, one purchase for $216.74 from Hertz Car Rental on February 15, 2009 was described as "Personal" but not included in the calculation of "Total Personal Expenses," which were listed as having a value of $3,917.52. I take the description of the $216.74 expense as "Personal" in DDX 1 as an admission and note that Jansing also previously described that expense as personal in a deposition. Jansing N.Y. Dep. 566. Thus, I consider its exclusion from the "Total Personal Expenses" to be an oversight and deem Jansing's admitted "Total Personal Expenses" to be $4,134.26.

[268]    *See* Tr. 551-53; DDX 1.

[269]    *Id.*; Jansing NY Dep. 554-55.

[270]    Tr. 552-53.

Of the remaining $35,815.92 in Amex charges, $7,943.60 relate to maintenance and repair of Jansing's Company vehicle, a truck.[271] The record indicates that the truck was purchased for business purposes, including to facilitate transportation of business materials, and provided ICE with a tax benefit.[272] Although Zutrau alleges that Jansing used this truck primarily as his personal vehicle, I am satisfied that maintenance and repair of the truck was a business expense.

Thus, $27,872.32 of the Amex charges remain in dispute. Apart from $1,473.38 in charges for which Jansing cannot recall the purpose, Jansing generally has averred that all of the remaining charges were for business expenses.[273] Based on her review of the Amex card statements, Zutrau stated her opinion at trial that each of these expenses was most likely personal or otherwise not a proper business expense, but she admitted that the information available from the credit card statements does not provide definitive proof one way or another.[274] Because neither side has submitted convincing evidence as to the nature of these expenses, whether Jansing's charging of them to the Amex card should be treated as a breach of his fiduciary duties will depend upon who bears the burden of proof.

As the decision of whether or not to charge an expense to the Company card is a business decision, it is, by default, entitled to the presumption of the business judgment

[271]    *See* Tr. 551-52 (Jansing); DDX 1.

[272]    *See* Tr. 202-03 (Zutrau); JX 539.

[273]    *See* Tr. 549-51; DDX 1.

[274]    Tr. 101, 272-75.

74

rule.[275] Nonetheless, Zutrau makes two arguments for shifting the burden to account for the Amex charges to Jansing in the circumstances here.

First, citing *Technicorp Int'l II, Inc. v. Johnston*,[276] Zutrau argues that, because there are undisputed instances where Jansing used corporate funds to pay for personal expenditures, Jansing should bear the burden of demonstrating that the remaining charges she challenges were incurred for a proper business purpose. I do not read *Technicorp* as supporting Zutrau's position. In *Technicorp*, the plaintiffs made a "*prima facie* showing" that the two individual defendants had diverted over $11 million away from one of the plaintiff companies while it was under the exclusive control of the defendants.[277] Under those circumstances, the Court stated that the defendants "have the burden of showing that they dealt properly with corporate funds and other assets entrusted to their care" and "have a duty to account for their disposition of those funds, i.e., to establish the purpose, amount, and propriety of the disbursements."[278] Here, Zutrau has not made a *prima facie* showing that any of the remaining Amex charges were incurred improperly; rather, her challenges to those charges are based on speculation and are not supported by substantial evidence.[279]

---

[275]    *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

[276]    2000 WL 713750 (Del. Ch. May 31, 2000).

[277]    *Id.* at *15.

[278]    *Id.* at *16.

[279]    *See* Tr. 101, 272-75 (Zutrau).

75

Another case that arguably supports Plaintiff's first argument for shifting the burden is *Carlson v. Hallinan*, but it, too, is not controlling under these facts.[280] In *Carlson*, in response to evidence submitted by the plaintiff that the defendant directors systematically were diverting corporate assets to benefit other entities they owned, and failing to keep track of those expenditures, the Court concluded that an accounting was necessary "to determine the extent of the misallocation of expenses and the damages resulting therefrom."[281] Although ICE's lack of formal expense reporting is far less than ideal, I find that the relatively minimal nature of the personal expenses that Jansing has been shown to have charged to the Company over a span of six years is not sufficient to warrant shifting the burden of proof to him.[282]

Second, Zutrau renews her first motion to compel and argues that a shifting of the burden of proof is appropriate as a sanction for Jansing's failure to comply with his discovery obligations. By way of background, on February 27, 2013, Zutrau served Jansing with her Third Request for the Production of Documents (the "Third Request for Production"),[283] in which she requested, among other things, approximately eighty-five merchant receipts for various purchases charged to Jansing's Amex card from 2007 to

---

[280]   925 A.2d 506 (Del. Ch. 2006).

[281]   *Id.* at 537.

[282]   *See Sutherland v. Sutherland*, 2010 WL 1838968, at \*16 (Del. Ch. May 3, 2010) (rejecting plaintiff's attempt to "have the Court impose an affirmative duty on fiduciaries to come forward and explain the allocation of company funds at the behest of any inquiring shareholder").

[283]   Pl.'s Mot. to Compel Ex. C (D.I. No. 112).

2012. On April 4, 2013, Jansing responded to the Third Request for Production. He objected to Zutrau's requests for receipts, among other requests, on the grounds that they were unduly burdensome, duplicative, and unnecessary,[284] and refused to produce the receipts.

Zutrau filed a motion to compel production of withheld documents responsive to the Third Request for Production on May 1, 2013, the last day of fact discovery.[285] I heard argument on that motion in conjunction with the pre-trial conference on July 25, 2013, less than a week before the commencement of trial. Due to the limited time remaining before trial, I determined that ordering production of the multitude of documents requested by Zutrau's motion would not be practical, but took the motion under advisement and granted Zutrau leave to pursue certain burden shifting arguments originally raised in her motion in post-trial briefing.

Zutrau now argues that, based on Jansing's failure to produce the receipts she requested in her Third Request for Production, the burden should be shifted to him to prove that all of the challenged Amex charges were proper business expenses. At the outset, I conclude that such wholesale burden-shifting would be inappropriate. Only nineteen of the receipts that Zutrau requested in her Third Request for Production actually correspond to any of the over 300 Amex charges that she questions in this

---

[284] *Id.* Ex. D.

[285] Pl.'s Mot. to Compel; First Am. Case Scheduling Order (D.I. No. 94).

action.[286] Moreover, of the nineteen receipts that are relevant to Zutrau's claims, twelve relate to purchases that were made using rewards points.[287] Thus, only seven of the numerous receipts Zutrau requested correspond to Amex charges that she challenges in this action that were not redeemed with rewards points. Those charges were for the following transactions: (1) $150 to the Golf Shop Inc. on July 30, 2007; (2) $1004.50 to PC Richard & Sons on September 28, 2008; (3) $902.96 to PC Richard & Son on March 10, 2010; (4) $456 to the Southampton Inn on November 12, 2010; (5) $963.87 to the Southampton Inn on November 17, 2010; (6) $651.73 to Best Buy Co. on December 1, 2010; and (7) $1,060.00 to Bissinger's Web Catalog on May 5, 2011.[288] The total amount of these seven charges is $5,189.06.

As to these seven charges for which receipts were requested, I hold that burden-shifting is appropriate. Court of Chancery Rule 26(b)(1) provides that parties may obtain discovery of any non-privileged matter which "is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party" and appears "reasonably calculated to lead to the discovery of admissible evidence." In her Third Request for

---

[286] *Compare* Pl.'s Mot. to Compel Ex. C, *with* JX 507 Ex. B.

[287] *Compare* Pl.'s Mot. to Compel Ex. C, *with* JX 507 Ex. B, *and* DDX 1. The twelve purchases that were made with rewards points include one purchase of $136.95 from Frontgate Catalog Household on September 3, 2009 that initially was charged to the Amex card and later backed out using rewards points. *See supra* note 265 & accompanying text.

[288] *See supra* note 286.

Production, Zutrau requested receipts for the seven disputed charges enumerated above. I find her requests for those receipts were reasonably calculated to lead to the discovery of admissible evidence. Jansing's objections that the receipts were duplicative and unnecessary in light of the Amex statements, which provide only general information as to the date and amount of the purchases and the relevant vendors, is unpersuasive. I also reject Jansing's objection that production of the receipts would have been overly burdensome. The receipts relevant to the Amex charges were kept in ICE's records along with the Amex statements.[289]

Thus, Jansing should have provided Zutrau with at least the seven requested receipts now at issue. Under these circumstances, I consider shifting the burden of proof as to the seven underlying purchases to be an appropriate equitable sanction for Jansing's failure to comply with his discovery obligations. As to those seven purchases, I therefore conclude that Jansing has the burden "to account for [his] disposition of those funds, *i.e.*, to establish the purpose, amount, and propriety of the disbursements."[290]

Jansing has failed to meet this burden. To prove the propriety of the contested Amex charges, Jansing relies almost entirely upon the demonstrative exhibit he presented at trial, which lists the challenged Amex charges and the purported business purposes for the charges that Jansing asserts were proper.[291] A demonstrative exhibit is not

---

[289] Henriksen N.Y. Dep. 74.

[290] *Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, at *16 (Del. Ch. May 31, 2000).

[291] *See* DDX 1.

79

substantive evidence, however, and Jansing provided no particularized testimony as to the contested charges or documentation to support the business purposes listed on the demonstrative. Thus, Jansing has failed to meet his burden as to those charges and will be deemed to have improperly charged the Company for an additional $5,189.06.

Jansing's use of his Amex card to make the remaining contested purchases, totaling $22,683.26, is protected by the business judgment rule. As to these, Zutrau has presented no substantive evidence sufficient to overcome the business judgment presumption. Jansing is presumed, therefore, to have made those purchases in accordance with his fiduciary duties. In sum, I conclude that Jansing improperly charged the Company for $14,388.86 out of the $50,992.42 in purchases that Zutrau challenges. To that extent, Jansing breached his duty of loyalty.

### b. Zutrau's remaining claims that Jansing improperly caused ICE to pay for personal expenditures

In addition to challenging Jansing's use of his Amex card, Zutrau claims that Jansing improperly caused ICE to pay for several other personal expenses, including interest on funds that he withdrew from the Credit Line as well as various personal tax, legal, and accounting expenses.[292]

---

[292] Earlier in this litigation, Zutrau questioned the propriety of annual charitable contributions that Jansing caused ICE to make to the Jansing Cook Foundation, a charitable trust of which he is a trustee. *See* Tr. 93-94 (Zutrau); JX 507 Ex. C. Zutrau did not address those contributions in her post-trial briefing, however. I, therefore, consider any claims based upon them to be waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999).

Most significantly, Zutrau questions Jansing's withdrawal of $250,000 from the Credit Line on June 19, 2007, the day before her termination, and placement of that money in his personal Citibank account. At various times over the course of this litigation, Zutrau has suggested that Jansing withdrew the money to help him make the $271,000 down payment he made on his new home in Southampton, New York, two days after she was fired. The amount and timing of the down payment is suspicious. The record developed at trial, however, shows that Jansing used separate funds to make that down payment and kept the available balance in his Citibank account at approximately $250,000 until he later used the funds from that account to repay the principle balance on the Credit Line on November 27, 2007.

Nonetheless, it is undisputed that Jansing caused ICE to pay the interest on the Credit Line during the five months that the borrowed sum of $250,000 was in his personal account. The total interest that ICE paid on the Credit Line as a result of Jansing's withdrawal was $9,919.52.[293] Jansing argues that he should not be liable for this amount, because he withdrew the balance of the Credit Line in reliance on his banker's advice that he should keep those funds in his personal account until such time as ICE could obtain a new credit line. I do not find Jansing's testimony regarding his reliance on his banker's advice to be exculpatory, however, because Jansing never applied for a new credit line. Rather, in October 2008, approximately one year after he

---

[293]    *See* JX 484; JX 346 at ISI 001819 (Interest Paid/Payable).

repaid the balance on the Credit Line and about a year and a half after Zutrau's termination, Jansing applied for an extension of the existing Credit Line.

Thus, Jansing has articulated no legitimate business justification for his withdrawal of the $250,000. Rather, the evidence suggests that Jansing took the challenged actions to facilitate his own efforts to keep the Credit Line in place without having to confront the possibility that Zutrau would remove her name as co-guarantor and create a risk that ICE would lose the Credit Line. The record indicates that if Zutrau had withdrawn her guarantee immediately, there was a material risk that the Credit Line would be revoked. In that regard, Jansing has admitted that, due to his poor credit, ICE would not have been able to obtain the Credit Line in the first place without the benefit of Zutrau's creditworthiness.[294] I also note that, in connection with Zutrau's termination, Jansing removed Zutrau's name and signatory power from all Company bank accounts, a credit card account, and a retirement benefits administration account, but conspicuously left Zutrau's name on the Credit Line as a co-guarantor until sometime after he repaid the $250,000 he had withdrawn.

In these circumstances, I find that Jansing intentionally withdrew $250,000 from the Credit Line so that ICE's minority stockholder, Zutrau, would have no choice but to remain financially responsible for that amount as a co-guarantor. Thus, Jansing also acted to serve his own purposes in terms of his efforts to sever his ties with Zutrau without giving her any notice and without having to negotiate with her about matters such

---

[294] Tr. 572-73; *see also* Tr. 33-34 (Zutrau).

as her guarantee on the Credit Line, and not to further any legitimate business purpose of ICE. Jansing's conduct amounted to a breach of his duty of loyalty, which warrants holding him liable for the interest that ICE paid on that withdrawal. Although Jansing claims that he repaid a portion of the interest,[295] he adduced no credible evidence as to the amount of any such repayment. Therefore, I find that the Company has a legitimate claim against Jansing for the full amount of the interest that it paid, or $9,919.52.

Zutrau also alleges that, in December of 2007, Jansing caused ICE to pay $12,315 of his personal income taxes and wrote it off as an expense of ICE. As to this claim, I credit Kalaygian's trial testimony that the $12,315 constituted ICE's portion of the taxes due on Jansing's income, not Jansing's own tax liability.[296]

In addition, Zutrau claims that Jansing improperly used ICE's corporate funds to pay for personal legal and accounting work and caused ICE to reimburse him for various out of pocket expenses that were personal in nature. Zutrau failed to pursue these claims at trial, however, and proffered no probative evidence in support of them or any related damages. Thus, she has failed to prove this aspect of her claims for inappropriate payment of personal expenditures.

### 5. Zutrau's claim that Jansing failed to replace Zutrau with someone who could provide oversight

Zutrau claims that Jansing breached his duties of care and loyalty by choosing to keep the position of Treasurer vacant after her termination and by failing to replace her

---

[295] Tr. 508-09 (Jansing).

[296] Tr. 691.

with anyone who could provide competent financial oversight of the Company, all so that he could use ICE's assets for his own personal benefit and engage in unchecked self-dealing. In that regard, Zutrau criticizes Jansing's appointment of Henriksen to serve as Controller and his retention of Kalaygian to assist with the Company's financials. She alleges that they were unable to fill the oversight void left by her termination because both Henriksen and Kalaygian are unqualified for their positions and are beholden to Jansing.

Jansing's business decision not to appoint a new Treasurer and, instead, to hire Henriksen and Kalaygian to replace Zutrau and perform most of the functions that she previously performed at ICE is entitled to the presumption of the business judgment rule.[297] Thus, the burden is on Zutrau to prove that Jansing breached his fiduciary duties in making that decision. Zutrau has failed to do so.

As to the duty of loyalty, I find that Zutrau's claim that Jansing failed to replace her with people competent to provide oversight in order to facilitate his own self-dealing fails, as a matter of fact and law, because Zutrau—who was a minority stockholder and officer, but not a director of ICE, like Jansing—never had the authority to oversee or prevent the few instances of inappropriate self-dealing by Jansing that she has proven.[298] The two examples of self dealing by Jansing that have been shown in the six year period

---

[297]     *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

[298]     *See* JX 196 ¶ 2 (Stipulation by Zutrau in the New York Action, stating: "My work at ICE was at all times under the control of Jansing, who was the Company's majority owner, President, and sole Director.").

84

following Zutrau's termination are: (1) that Jansing paid himself excessive compensation; and (2) that Jansing improperly charged certain personal expenses to his Amex card.[299]

As to the first example, Jansing always has been responsible for setting employee compensation at ICE, including his own, and Zutrau adduced no evidence that she ever had the authority to overrule those determinations.[300] As Zutrau averred in a stipulation in the New York Action, "Jansing set the compensation for all Company employees, including raises and bonuses, and I had no authority to do so."[301] Turning to the second example, although it is undisputed that Zutrau successfully had prompted Jansing to reimburse the Company for certain personal expenses charged to his Amex card in the past, she would not have had the authority to overrule him if Jansing insisted that a given charge be treated as a business expense.[302] Furthermore, even if Zutrau's questioning of Jansing's Amex charges may have inconvenienced or annoyed him, I find it implausible that Jansing would have fired Zutrau and appointed Henriksen and Kalaygian as her replacements to facilitate his ability to charge his personal expenses more freely to the Company. Therefore, Zutrau has failed to prove a breach of the duty of loyalty in connection with this claim.

---

[299] I also concluded that Jansing's withdrawal of $250,000 from the Credit Line was done in bad faith in that Jansing sought to serve his own interests rather than the best interests of ICE. That action, however, was not self-dealing in the traditional sense. In any event, Zutrau at no time had the authority to prevent Jansing from making such a unilateral withdrawal. *Id.*

[300] Tr. 485 (Jansing).

[301] JX 196 ¶ 5.

[302] *See id.* ¶ 2.

As to the duty of care, Zutrau has neither alleged nor presented evidence suggesting that Jansing failed to inform himself properly before deciding to terminate her and hire her replacements, nor has she proven any other deficiencies in Jansing's decision-making process that would support a claim for breach of that duty. Thus, Zutrau has failed to demonstrate that Jansing breached his duty of care by terminating her employment and replacing her with Henriksen and Kalaygian.

I also note that to the extent that Zutrau's claim can be interpreted as challenging Jansing's own failure to exercise proper oversight over the Company, she has not proffered evidence of the type of "sustained or systematic failure" needed to succeed on such a claim.[303]

Having addressed the merits of each of Zutrau's derivative claims against Jansing for breach of his fiduciary duties, I now turn to her direct claims challenging the Reverse Stock Split.

### D.      Claims Challenging the Reverse Stock Split

Sections 242 and 155 of the DGCL authorize a corporation to effect a reverse stock split via a charter amendment that may result in stockholders with fractional interests being cashed out of the corporation.[304]  Section 242 provides that a corporation may amend its COI to "subdivid[e] or combin[e] the outstanding shares of any class . . .

---

[303]     *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006) (quoting *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996)).

[304]     *See Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 455 (Del. Ch. 2011).

of shares into a greater or lesser number of outstanding shares,"[305] which may result in some stockholders getting fractional interests. Under Section 155 of the DGCL, if a corporation effects a transaction that results in fractional interests, it may opt to compensate stockholders in lieu of issuing fractional shares, in which case it must "pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined."[306]

On June 11, 2012, Jansing filed an amendment to ICE's COI and thereby effecting the Reverse Stock Split, at a ratio of one share for every 62.5 outstanding shares.[307] The amendment to the COI provided that, following the split, any stockholders holding less than one share of ICE stock would be cashed out in lieu of receiving fractional shares. As a result of the Reverse Stock Split, Jansing's 125 shares of ICE stock (representing about 78% of the outstanding equity) were converted into two shares, and Zutrau's 36 shares of ICE stock (representing about 22% of the outstanding equity) were converted into .576 shares.[308] In connection with the Reverse Stock Split, Jansing notified Zutrau by letter that she was no longer a stockholder of ICE and provided her with a check for $495,778.81, which Jansing described as "the fair value for your fractional shares."[309] Zutrau never deposited the check.

---

[305]    8 *Del. C.* § 242(a)(3).

[306]    8 *Del. C.* § 155.

[307]    JX 681.

[308]    *See id.*; JX 501.

[309]    JX 501.

87

Zutrau challenges the Reverse Stock Split on two principal grounds. First, she argues that Jansing effected the Reverse Stock Split for the sole purpose of depriving her of standing to pursue her derivative claims, in breach of his fiduciary duties. Second, she contends that she received inadequate consideration for her fractional shares, in breach of Jansing's fiduciary duties as well as the "fair value" requirement of Section 155. By way of relief as to both grounds, Zutrau seeks to have the Reverse Stock Split rescinded and to be reinstated as an ICE stockholder.

When, as here, "a controlling stockholder uses a reverse split to freeze out minority stockholders without any procedural protections, the transaction will be reviewed for entire fairness with the burden of proof on the defendant fiduciaries."[310] This is because "[a] reverse split under those circumstances is the functional equivalent of a cash-out merger."[311] As previously noted,[312] "[t]he concept of fairness has two basic aspects: fair dealing and fair price."[313] I address both of Zutrau's challenges to the Reverse Stock Split in the context of analyzing the transaction's entire fairness.

### 1. Fair dealing

For purposes of assessing fair dealing, a brief review of the factual background leading up to the Reverse Stock Split is necessary. Zutrau was terminated from ICE in June 2007. In the first half of 2008, she commenced a books and records action against

---

[310] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 460 (Del. Ch. 2011).

[311] *Id.* (internal quotation marks omitted).

[312] *See supra* notes 226-229 and accompanying text.

[313] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

Jansing and ICE in the New York Court. On August 1, 2008, the New York Court ordered Jansing to produce ICE's books and records.

In September 2009, Zutrau commenced the New York Action by filing a complaint against Jansing and ICE, asserting, among other things, derivative claims challenging numerous actions taken by Jansing in the course of running the Company. In October 2011, the New York Court issued an opinion that, among other things, dismissed Zutrau's derivative claims without prejudice, holding that they could not be pursued in New York but could be asserted in a separate action.[314]

In December 2011, before the commencement of this action, Jansing retained Farrell Fritz, P.C. as counsel to advise him regarding how to accomplish a reverse stock split. On January 13, 2012, Jansing, through counsel, engaged Duff & Phelps for the purpose of "estimating [the] Fair Value of 100 percent of the Shareholders' Equity of ICE Systems as of a current date to be provided by [Farrell Fritz]."[315]

On April 25, 2012, Zutrau commenced this litigation by filing a verified complaint against Jansing in which she effectively reasserted the derivative claims that had been dismissed from the New York Action. Jansing was served on May 11, 2012, and later requested a 30-day extension to file a responsive pleading. The Court granted a 20-day extension, giving Jansing until June 20, 2012 to respond to the Complaint.[316]

---

[314]    *Zutrau v. Ice Sys., Inc.*, 2011 WL 5137152, at *4 (N.Y. Sup. Ct. Oct. 28, 2011).

[315]    JX 497.

[316]    D.I. No. 10.

On June 11, 2012, Duff & Phelps issued a valuation report, estimating the fair market value of 100% of the equity in the Company as of June 5, 2012 as being $2,217,233. That same day, Jansing filed the amendment to ICE's COI that implemented the Reverse Stock Split. Jansing utilized the Duff & Phelps report to value Zutrau's 22% interest in the Company at $495,779, which reflects her *pro rata* share of the Duff & Phelps valuation with no minority discount.

Recognizing that it is ultimately Jansing's burden to demonstrate entire fairness, I pause initially to consider Zutrau's main challenge to the validity of the Reverse Stock Split. Based on its timing, Zutrau argues that it is self-apparent that Jansing effectuated the Reverse Stock Split "for the sole, fraudulent, and faithless purpose of eliminating Plaintiff's standing to maintain the derivative claims originally brought in the New York action and re-filed in Delaware on April 25, 2012."[317] In support of that view, Zutrau asserts that Jansing has not "offer[ed] any conceivable, legitimate business purpose that would justify his approval of the Reverse Stock Split, other than to deprive Plaintiff of derivative standing."[318] Based on my review of the record developed at trial, I disagree with Zutrau and find that depriving Zutrau of derivative standing was not a primary motivation for the Reverse Stock Split. This finding is informed by three primary considerations.

---

[317] Pl.'s Opening Br. 30.

[318] *Id.* at 31.

First, Jansing has articulated a credible business justification for the Reverse Stock Split. By the time of the Reverse Stock Split in June 2012, the parties had been embroiled in contentious litigation for over four years in two different states. Jansing testified that people in the industry in which ICE operates were aware of the litigation between ICE's stockholders and that it was a cause for concern among some of ICE's clients.[319] After "years of withering litigation," Jansing claimed that his decision to implement the Reverse Stock Split was motivated by "the desire to have everybody get on with their lives" and to "mov[e] the company forward and hav[e] everybody go on their separate ways."[320] Based on the contentiousness I have observed in this litigation and the parties' sharply divergent concepts of how the Company should be run, I accept Jansing's testimony that the primary purpose of the Reverse Stock Split was to bring an end to the turbulent relationship between the parties and to allow both of them and the Company to move on.

Second, although the timing of the Reverse Stock Split on its face is suspicious, the process that led to it began before the filing of this action. Specifically, Jansing engaged both Farrell Fritz and Duff & Phelps after the New York Court's decision to sever the derivative claims, but before Zutrau filed her complaint in Delaware. At that time, there were no outstanding derivative claims against Jansing and it was unclear when

---

[319]    Tr. 547.

[320]    *Id.* at 546-47.

91

or whether Zutrau would reassert those claims.[321]  Jansing testified that the Reverse Stock Split was the culmination of a process being led by Farrell Fritz, and that the timing was unrelated to the filing of the derivative claims in this action.[322]  That may be an overstatement, but, in any event, I find that Jansing would have implemented the Reverse Stock Split whether or not Zutrau filed this action.

Third, and most significantly, while Jansing previously has argued that Zutrau lacks standing to assert her derivative claims independently of the other claims in this action, he consistently has stated that he has no objection to Zutrau effectively litigating her derivative claims for purposes of valuing her interest in ICE in connection with the Reverse Stock Split.[323]  In that regard, Jansing has suggested that Zutrau would be entitled, as additional consideration, to 22% of the value (based on her percentage equity ownership) of any derivative claims that ICE had against Jansing at the time of the Reverse Stock Split.[324]  This approximates, at least in part, the monetary relief that Zutrau could have obtained if she still had standing to assert the derivative claims.

For the foregoing reasons, I conclude that Jansing did not implement the Reverse Stock Split for the sole or primary purpose of depriving Zutrau of derivative standing. That fact alone, however, does not establish fair dealing, and other factors undermine the fairness of the process that culminated in the Reverse Stock Split.  For one thing, Jansing

---

[321]  *Id.* at 661-62 (Jansing).

[322]  *Id.* at 658-59.

[323]  Def.'s Opening Br. 58; *see* Tr. 549, 661-62.

[324]  Def.'s Opening Br. 58.

92

failed to implement any procedural protections in connection with the Reverse Stock Split, other than retaining his own (and ICE's) legal counsel and investment advisor. He did not, for example, form a special committee or otherwise arrange for anyone to bargain on behalf of or with the minority stockholder. Indeed, it does not appear that Zutrau was consulted about the Reverse Stock Split at any time before its execution. Furthermore, although Jansing relied on a contemporaneous valuation of the Company in determining the fair value of Zutrau's shares, that valuation was produced by a valuation consulting firm, Duff & Phelps, that essentially was working for Jansing and knew that its valuation was to be used for purposes of a transaction by which Jansing, through ICE, would buy out ICE's minority stockholder.[325] For all of these reasons, I conclude that Jansing failed to prove that the Reverse Stock Split was the product of fair dealing.[326]

## 2. Fair price / Fair value

As recently clarified by this Court in *Reis v. Hazelett Strip-Casting Corp.*,[327] the fair price standard of entire fairness and the fair value standard applicable to compensation for fractional interests under Section 155(2) of the DGCL call for equivalent economic inquiries.[328] For both, the appropriate test, as in the appraisal

---

[325]    Tr. 735 (D'Almeida).

[326]    *See Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 460 (Del. Ch. 2011) (finding lack of fair dealing where majority shareholder effected reverse stock split without procedural protections and without engaging in good faith negotiations with minority shareholders).

[327]    28 A.3d 442.

[328]    *See id.* at 461-64.

93

context, is whether the "minority stockholder shall receive the substantial equivalent in value of what he had before."[329] In assessing the value of the shares that were held before the relevant transaction, the Court must consider "all relevant factors," including "assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[330]

### a. The Duff & Phelps report

Jansing used the Duff & Phelps valuation report as his basis for valuing Zutrau's shares. I therefore begin my analysis of fair price by assessing the merits of that report. Jaime D'Almeida, a Director at Duff & Phelps, was the principal author of the Duff & Phelps report and was called by Jansing as an expert witness at trial. Duff & Phelps utilized three valuation methods in valuing ICE: the discounted cash flow (DCF) method, the comparable companies method, and the comparable transactions method.[331] The DCF method produced a fair market valuation for ICE of $2,217,233; the comparable companies method produced a valuation of $2,012,003; and the comparable transactions method produced a valuation of $1,328,965.[332] Duff & Phelps ultimately concluded that, due to ICE's lack of similarity to the most comparable companies that could be identified, the comparable companies and comparable transactions valuation methods did

---

[329] *Id.* at 462 (quoting *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107 (Del. 1952)).

[330] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[331] Tr. 723-24 (D'Almeida); JX 500 Schedule 1.

[332] JX 500 Schedule 1.

94

not produce reliable estimates of ICE's value.[333] It therefore assigned a 100% weight to the results of the DCF method, which produced the highest valuation of the three methods utilized.[334]

As an initial matter, I concur with Duff & Phelps that the DCF method should be given exclusive weight in valuing ICE. The utility of a comparable, or market-based, approach to valuation "depends on actually having companies that are sufficiently comparable that their trading multiples provide a relevant insight into the subject company's own growth prospects."[335] In that regard "[r]eliance on a comparable companies or comparable transactions approach is improper where the purported 'comparables' involve significantly different products or services than the company whose appraisal is at issue, or vastly different multiples."[336] Because ICE operates in what is effectively a two player market, and its direct competitor is significantly larger and has a 99% market share, the comparable companies and transactions methods are not likely to yield reliable estimates of ICE's value.

By contrast, the DCF method provides an effective way to measure ICE's fair market value. Delaware Courts frequently have applied the DCF method in valuing

---

[333]    Tr. 727-28 (D'Almeida).

[334]    *Id.* at 729; JX 500 at 38.

[335]    *In re Orchard Enters., Inc.*, 2012 WL 2923305, at *10 (Del. Ch. July 18, 2012), *aff'd,* 2013 WL 1282001 (Del. 2013) (ORDER).

[336]    *Id.*

companies and have described it as "in theory the single best technique to estimate the value of an economic asset."[337] As this Court has noted,

> [t]he basic premise underlying the DCF methodology is that the value of a company is equal to the value of its projected future cash flows, discounted at the opportunity cost of capital. Put simply, the DCF method involves three basic components: (i) cash flow projections; (ii) a terminal value; and (iii) a discount rate.[338]

Setting aside for the moment the existence of Jansing's fiduciary breaches and the impact of those breaches on the fair value of Zutrau's shares at the time of the Reverse Stock Split, I consider first whether the Duff & Phelps DCF analysis can be regarded as an accurate estimate of ICE's value in light of its historical performance up to that point.

In June of 2012, when the Duff & Phelps report was done, management of ICE did not have any projections for ICE's future performance.[339] Duff & Phelps, therefore, independently analyzed ICE's historical performance from fiscal year 2007 through the first half of 2012 (the "historical period") to project future cash flows for the remainder of 2012 through to fiscal year 2014.[340] Duff & Phelps used ICE's average revenues during the historical period as its revenue baseline. To assess ICE's expected rate of revenue growth, Duff & Phelps looked to the forecasted growth rate of the "transaction publishing" segment of the "strategic document outsourcing industry," which is the

---

[337]    *Cede & Co. v. Technicolor, Inc.*, 1990 WL 161084, at *7 (Del. Ch. Oct. 19, 1990).

[338]    *In re Orchard Enterprises, Inc.*, 2012 WL 2923305, at *10.

[339]    JX 500 at 30.

[340]    *Id.*; Tr. 724 (D'Almeida).

96

business segment in which Duff & Phelps concluded ICE operates.[341] The strategic document outsourcing industry "is comprised of service providers that assist companies in customer and investor communications through document processing and scanning and high volume transaction printing."[342] The core competencies of transaction publishing include "transaction documents, transpromo document production, content versioning, and response analysis."[343] The forecasted growth rate of the transaction publishing segment between 2010 and 2015 was 1.6 percent.[344] In light of ICE's "first mover advantage" in the proxy processing space, however, Duff & Phelps concluded that a higher revenue growth rate of 2.1 percent was appropriate. That rate equaled the forecasted long-term U.S. inflation rate.[345]

Duff & Phelps projected that ICE's operating expenses would remain constant as a percentage of sales, based on the average operating expenses as a percentage of sales during the historical period. Duff & Phelps made three normalizing adjustments in order to remove non-operating or non-recurring expenses from ICE's projected future expenses.[346] Specifically, Duff & Phelps removed from expenses the cost of Jansing's annual charitable contributions, certain non-recurring bank fees, and legal costs that it

---

[341] JX 500 at 20.

[342] *Id.*

[343] *Id.*

[344] *Id.* at 21.

[345] *Id.* at 30-31; Tr. 724 (D'Almeida).

[346] Tr. 724-25 (D'Almeida); JX 500 at 31.

97

determined most likely would be non-recurring.[347]  Although ICE is an S corporation and

such corporations are not taxed at the entity level, Duff & Phelps, following this Court's

practice in *Delaware Open MRI Radiology Associates, P.A. v. Kessler*,[348] estimated an

"equivalent, hypothetical 'pre-dividend' S corporation tax rate"[349] of 28.8 percent, which

it applied to ICE's projected operating cash flows.[350]

To determine the applicable discount rate to apply to future cash flows, Duff &

Phelps used the well-established Capital Asset Pricing Model (CAPM), which measures

the required rate of return of equity capital based on the relative risk of the investment, as

well as the time value of money.[351]

Based on that approach, Duff & Phelps calculated a cost of capital, and thus a

discount rate, of 12.9 percent.  Discounting its free cash flow projections for the latter

half of 2012, 2013, and 2014, Duff & Phelps calculated the present value of the free cash

---

[347]  Tr. 724-25 (D'Almeida); JX 500 at 31.

[348]  898 A.2d 290, 336-30 (Del. Ch. 2006).

[349]  *Id.* at 330.

[350]  JX 500 at 32-33.  This hypothetical rate is the corporate tax rate that a C corporation would have to have in order to achieve the same amount of income available after dividends as the S corporation. *See Delaware Open MRI Radiology Assoc., P.A.*, 898 A.2d at 330.  In calculating this rate, Duff & Phelps assumed that ICE's shareholders are taxed at a personal tax rate of 39.5%, accounting for Federal and New York state personal tax rates.  JX 500 at 33.

[351]  Tr. 725-26 (D'Almeida); JX 500 at 28.  Because ICE's capital structure is 100 percent equity, Duff & Phelps did not need to estimate the required return on debt. JX 500 at 28.  For a more detailed description of the CAPM calculation, see *In re Orchard Enters., Inc.*, 2012 WL 2923305, at \*18 (Del. Ch. July 18, 2012) (citing Richard A. Brealey, Stewart C. Myers & Franklin Allen, *Principles of Corporate Finance* 214 (9th ed. 2008)).

flows from those years to be $309,029, $159,267, and $144,011, respectively, for a total of $612,307.[352]

To calculate the terminal value, Duff & Phelps used the Gordon Growth Model.[353] The terminal year cash flow was then capitalized using a rate calculated by subtracting the long-term expected growth rate of 2.1 percent from the CAPM discount rate of 12.9 percent. The present value of the capitalized terminal year cash flow was calculated to be $1,359,397.[354]

The total present value of the free cash flows from the projection years and the terminal period, *i.e.*, ICE's "enterprise value," was thus $1,971,704.[355] To this, Duff & Phelps added ICE's non-operating assets, including $100,000 in outstanding investments and $145,527 in funds that were owed to the Company by Jansing.[356] Accounting for fractional dollar amounts, this led to a total fair market valuation for ICE of $2,217,233, which is the number on which Jansing relied in valuing Zutrau's shares.[357]

Having reviewed the Duff & Phelps report in detail, I conclude that it accords with valuation practices endorsed by Delaware Courts and provides an appropriate baseline

---

[352] JX 500. Schedule 1. The estimated present value of the free cash flows for the second half of 2012 were elevated, because ICE collects most of its revenues in the second half of the year. *Id.* at 23.

[353] JX 500 at 33.

[354] *Id.* Schedule 1.

[355] *Id.*

[356] *Id.* at 34; Tr. 726 (D'Almeida).

[357] JX 500 Schedule 1.

estimate of the fair market value of ICE, not accounting for Jansing's fiduciary breaches or the effect of those breaches on the financial performance of the Company. In other words, if one were to assume that, at the time of the Reverse Stock Split, the Company had no outstanding derivative claims and that ICE's financial performance during the historical period reflected the performance of a company whose principals were acting in accord with their fiduciary duties, the Duff & Phelps report appropriately would reflect the fair value of the Company. In that regard, I note that Plaintiff's own valuation and damages expert, Roy D'Souza, used the Duff & Phelps valuation as his baseline valuation for the Company in calculating damages and stated that he would have no objection to that valuation were it not for Jansing's fiduciary breaches.[358]

Apart from noting its failure to account for Jansing's breaches of fiduciary duty, Zutrau raised only two objections to the Duff & Phelps report, neither of which is persuasive. First, she argues that the report uses an unreasonably low growth rate to project ICE's future revenues, on the grounds that the growth rate Duff & Phelps used was garnered from statistical industry data sources only remotely related to ICE. The transaction publishing segment of the strategic document outsourcing industry may not precisely correspond to the proxy services sector in which ICE operates. Nevertheless, I find that it is closely related enough to serve as a useful reference point in estimating ICE's growth rate. Moreover, Duff & Phelps ultimately assumed that ICE could be expected to grow at a rate that is above the forecasted growth rate for the transaction

---

[358]    *See* Tr. 426-27; D'Souza Dep. 33-34.

publishing segment (1.6 percent) and equivalent to the forecasted long-term U.S. inflation rate (2.1 percent). Given the highly competitive and saturated nature of the market in which ICE operates, I conclude that Jansing has shown by a preponderance of the evidence that a higher growth rate would not be justified.

Second, Zutrau contends that the Duff & Phelps valuation does not "faithfully respect the third-party interest ICE received."[359] Although ICE engaged in several acquisition discussions with ISS and Computershare in the past, most of those discussions failed to result in any firm offer to acquire ICE. The one documented acquisition offer that ICE received, namely, ISS's non-binding offer in 2009 to acquire the Company for $2.5 million, with a maximum earnout potential of $4 million, does not differ from the Duff & Phelps valuation so significantly as to throw its reliability into question.

Thus, I find that the Duff & Phelps report provides a methodologically sound valuation of the Company as of the time of the Reverse Stock Split, except for the fact that it does not account for the existence of Jansing's breaches of fiduciary duty or the impact of those breaches on the performance of the Company. That exclusion is significant, however, and, as a result of it, the Duff & Phelps valuation ultimately fails to capture the fair value of ICE at the time of the Reverse Stock Split. I next consider how properly accounting for Jansing's breaches of fiduciary duty would impact the valuation of the Company.

---

[359]    Pl.'s Opening Br. 49.

### b.    The effect of Jansing's fiduciary breaches on the valuation

I find that Jansing's breaches of fiduciary duty require that the Duff & Phelps DCF valuation be modified in two ways to arrive at the fair value of the Company at the time of the Reverse Stock Split.

First, the monetary value of the outstanding breach of fiduciary duty claims against Jansing must be added. This Court has determined that Jansing breached his fiduciary duties to the Company in the time period between Zutrau's termination in June 2007 and the Reverse Stock Split in June 2012. The Company therefore had claims against him for those breaches at the time of the Reverse Stock Split. As this Court has acknowledged in other contexts,[360] and as Jansing has expressly conceded,[361] those claims can be thought of as non-operating corporate assets the value of which should be added to that of the Company in determining fair value.

The Company had a claim against Jansing for personal expenses that he charged to his Company-issued Amex card that had a value of $15,000.[362] The Company also had a claim against Jansing for $9,919.52 in interest that he improperly caused the Company to pay on the Credit Line after he withdrew the full balance of that line and placed it in his

---

[360]    *See supra* note 198.

[361]    Def.'s Opening Br. 60-61.

[362]    This value reflects the $14,388.86 in personal expenses Jansing improperly charged to the Company during the period from June 2007 to June 2012 rounded to $15,000 to account for the addition of a reasonable amount of prejudgment interest. Because the individual expenditures were relatively small and numerous and spanned a period of several years, it is impracticable to compute a precise interest figure.

personal bank account. The value of that claim is $9,919.52 plus pre-judgment interest at the legal rate of 5.75% from November 27, 2007, the date the Credit Line was repaid, until June 11, 2012. Lastly, the Company had valid claims against Jansing, as of June 11, 2012, for paying himself excessive compensation in the following amounts: $190,080 in 2007; $121,000 in 2009; $75,680 in 2010; and $120,061.04 in 2011.[363] The collective value of these claims is $506,821.04 plus pre-judgment interest on those claims through June 11, 2012.[364] The value of each of the foregoing claims must be added to the Duff & Phelps valuation as a non-operating asset for it to reflect the fair value of the Company at the time of the Reverse Stock Split.

A second modification to the Duff & Phelps valuation is also required. Duff & Phelps' cash flow projections for ICE were based on the revenues and expenses of the

---

[363] As discussed *supra*, Plaintiff presented evidence regarding an alleged excessive bonus at the end of 2012. Using the same rationale as applied for the years from 2007 through 2011, the amount of the excess bonus for the calendar year 2012 would have been $79,275.68. I have not used that figure, however, in determining the appropriate remedy in this action for at least two reasons. First, the wrong evidently did not occur until December 2012 or later. Thus, that bonus could not have formed the basis of a derivative claim ICE would have had as of June 11, 2012, immediately before the Reverse Stock Split. Thus, that purported claim could not have given rise to the equivalent of a non-operating corporate asset. And second, based on the way in which Duff & Phelps projected expenses for 2012 in its DCF analysis, only the excess bonuses for the period ending before December 31, 2011 would have been relevant.

[364] To compute the pre-judgment interest on the excess bonus payments, I direct the parties to apply an interest rate of 5.75%, which was the legal rate of interest during most of the relevant period, compounded quarterly to each of the four excess bonus amounts from December 31 of the year corresponding to each bonus. Thus, for example, the interest on the excess bonus of $121,000 in 2009 will be computed from December 31, 2009 to June 11, 2012.

Company during the historical period. As to expenses specifically, Duff & Phelps projected that ICE's operating expenses would remain constant as a percentage of sales, based on the average operating expenses as a percentage of sales during the historical period (2007 to 2011). Payroll expenses during the historical period, however, were improperly inflated as a result of Jansing's self-payment of excessive bonuses. Thus, projecting that same level of inflated payroll expenses is, in effect, valuing the Company on the presumption of improper self-dealing continuing into the future. The fair value of the Company, however, is its going concern value without such self-dealing. For this reason, a normalizing adjustment is required to the Duff & Phelps model, removing the expenses attributable to Jansing's receipt of excessive compensation from the historical payroll expenses that served as the basis for projecting ICE's payroll expenses into the future.[365] At trial, D'Almeida acknowledged that such an adjustment would be appropriate if the Court concluded that Jansing paid himself excessive compensation.[366]

Accepting at face value the payroll expenses attributable to Jansing's compensation, Duff & Phelps calculated payroll expenses during the historical period to be, on average, 49.5% of revenues. If the excessive bonus compensation is removed, however, average payroll expenses as a percentage of revenues during the historical period decreases to approximately 46%. When that lowered percentage is projected into

---

[365] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 472 (Del. Ch. 2011) ("Delaware law on fair value . . . empower[s] a court to make normalizing adjustments to account for expenses that reflect controller self-dealing when the plaintiff/petitioner provides an adequate evidentiary basis for the adjustment.").

[366] Tr. 755-56 (D'Almeida).

the future, it produces a corresponding and significant increase in the projected free cash flows for the years 2012 to 2014 and the terminal period. I will direct Jansing, presumably with the assistance of Duff & Phelps, to compute the present value of those normalized cash flows for 2012, 2013, and 2014 and for the terminal period, and to share those figures with Zutrau's counsel before submitting them to the Court. The sum of those amounts will be the fair enterprise value of ICE. To calculate the total fair market value of ICE, its non-operating assets must be added to the enterprise value, including $100,000 for ICE's investments, $145,527 for funds owed to the Company by Jansing, and the value of the derivative claims, inclusive of pre-judgment interest on those claims through June 11, 2012, as described above.

As the Duff & Phelps report did not account for Jansing's breaches of fiduciary duty, the Duff & Phelps valuation did not reflect the fair value of the Company, and the Reverse Stock Split was executed at an unfair price. I therefore conclude that that transaction was not entirely fair to Zutrau, as ICE's minority stockholder. In that respect, the Reverse Stock Split did not comply with 8 *Del. C.* § 155(b) and the price for Zutrau's fractional shares must be recalculated in accordance with this Opinion.

Finally, I note that I have considered and reject as unpersuasive Zutrau's expert's proposed valuations of the Company.[367] D'Souza modeled three "but-for" scenarios, which he referred to as the "less conservative" scenario, the "conservative" scenario, and

---

[367] JX 293.

the "extremely conservative" scenario.[368] Under these scenarios, he estimated that the Company would have had a fair market value of $20,100,000, $18,300,000, and $7,300,000, respectively, but-for Jansing's breaches of fiduciary duty.[369] Each of the but-for scenarios analyzed by D'Souza, however, relied on highly unjustified assumptions. D'Souza's two more liberal valuations are based on the premise that, but for Jansing's fiduciary breaches, the Company would have successfully signed one or more of the large banking clients with whom ICE had been having discussions before Zutrau's termination, leading to dramatically increased revenues in every year since.[370] I find, however, that this premise is unsupported by the evidence and not related to any breach that has been proven. D'Souza's alternative, "very conservative" estimate is equally unavailing. That valuation essentially attributes all increases in numerous of ICE's expense categories since 2006 to Jansing's alleged fiduciary breaches, and makes several other unwarranted assumptions.[371] Zutrau failed to prove many of the claims for breach of fiduciary duties that underlie her expert's report. Thus, I reject the report of her damages expert as a method for ascertaining the effect of Jansing's fiduciary breaches on the value of the Company.

---

[368]    *Id.* at 36.

[369]    *Id.*

[370]    *Id.* at 20-26; Tr. 409-10 (D'Souza).

[371]    JX 293 at 26-28.

### c. Remedy

"In determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages."[372] Among the factors a Court will consider in determining an appropriate remedy is whether there is evidence of "fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching."[373]

Under the facts of this case, I consider an award of fair value to be the appropriate remedy. Contrary to Zutrau's assertions, I have found that Jansing did not execute the Reverse Stock Split to deprive her of derivative standing. Moreover, Jansing relied on a credible and largely independent valuation in determining the value of Zutrau's shares. In that regard, Zutrau has not shown that Jansing acted with a conscious intent to deprive her of the fair value of her shares, or deny her access to the benefits of pending corporate opportunities. The Reverse Stock Split was a self-interested transaction that I ultimately have concluded was achieved at an unfair price. It was not, however, the result of deliberate misconduct, fraud, or gross and palpable overreaching. In light of all relevant factors, therefore, I conclude that an award of fair value to Zutrau on the basis described in this Opinion will provide the appropriate remedy in this dispute. Zutrau also is entitled

---

[372] *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000).

[373] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983).

to prejudgment interest at the legal rate on the adjusted fair value of her fractional shares compounded quarterly from June 11, 2012 determined in accordance with this Opinion.

In reaching this conclusion, I also reject Zutrau's claim for rescission of the Reverse Stock Split and dissolution of ICE. Rescission is an equitable remedy and for the reasons discussed above, I am convinced that the equities attendant to Jansing's implementation of the Reverse Stock Split do not warrant undoing that transaction.[374]

### E.   Jansing's Counterclaim Asserting that the New York Judgment Should be Deducted from Amount Owed to Zutrau

In its post-trial decision, the New York Court determined that Zutrau was entitled to a judgment of $60,307, representing the positive balance of her ICE capital account. Jansing asserts a counterclaim in this action, arguing that the amount of the judgment in the New York Action should be setoff from any amounts owed to Zutrau in connection

---

[374]   In connection with her claim for rescission, Zutrau also sought an order from the Court to dissolve ICE. Because I reject Zutrau's claim for rescission, she no longer is an ICE stockholder and lacks standing to bring a dissolution action against the Company. Even assuming, however, that she could bring such a claim, I reject it on the merits. As Zutrau recognized in her post-trial briefing, "for a court to order a dissolution or liquidation of a solvent corporation, the proponents must show a failure of corporate purpose, a fraudulent disregard of the minority's rights, or some other fact which indicates an imminent danger of great loss resulting from fraudulent or absolute mismanagement." Pl.'s Opening Br. 56 (quoting *Warshaw v. Calhoun*, 221 A.2d 487, 491 (Del. 1966)). Moreover, "[t]he Court exercises this power to dissolve a solvent corporation with great restraint and only upon a strong showing." *Id.* (quoting *Carlson v. Hallinan*, 925 A.2d 506, 543 (Del. Ch. 2006)). Zutrau has failed to show that any of the factors specified in *Warshaw* are present here. In addition, Zutrau has made no showing, let alone a strong showing, that there are any reasonable grounds to dissolve ICE, a solvent corporation. Therefore, I also deny with prejudice Zutrau's claim that ICE should be dissolved.

with the Reverse Stock Split, because the amount remaining in her capital account effectively was included already in the initial $495,788.81 valuation of her fractional shares. I reject this counterclaim as barred by collateral estoppel.

"The doctrine of collateral estoppel essentially prohibits a party who has litigated one cause of action from relitigating in a second cause of action matters of fact that were, or necessarily must have been, determined in the first action."[375] Collateral estoppel applies if: (1) the same issue is presented in both actions; (2) the issue was litigated and decided in the first action; and (3) the determination was essential to the prior judgment.[376]

By the time of trial in the New York Action, Jansing had effected the Reverse Stock Split and issued Zutrau a check for $495,788.81. In arguing in the New York Action against Zutrau's claim that she was entitled to the $60,307 in her ICE capital account, Jansing made the same factual argument that he now advances in this Court, namely, that the $60,307 already was included in the amount tendered to Zutrau in connection with the Reverse Stock Split. In rejecting that argument, the New York Court held as follows:

> The record reveals that the plaintiff received a check in June 2012 for $495,778.71, which represented the value of her ICE stock. Although Jansing testified that he believed the $60,307 was included in that amount, he presented no evidence of how the $495,778.71 was computed. Accordingly, the court finds

---

[375] *Sanders v. Malik*, 711 A.2d 32, 33 (Del. 1998)

[376] *Id.* at 33-34.

109

that the plaintiff is entitled to a judgment in the amount of $60,307.[377]

In other words, the Court held that Jansing had failed to meet his burden of proof to show that the amount tendered to Zutrau in connection with the Reverse Stock Split included the amount remaining in her capital account and decided that factual issue adversely to him. That decision appears to have been necessary to the New York Court's judgment. The court presumably would not have awarded Zutrau $60,307 in damages if it had accepted Jansing's argument that that amount already had been tendered to her. I therefore deny Jansing's counterclaim for an offset in the amount of $60,307.

### F.    Costs

Under Court of Chancery Rule 54(d), costs "shall be allowed as of course to the prevailing party unless the court otherwise directs."[378]   Under Rule 54(d), the "prevailing" party is a party who successfully prevails on the merits of the main issue or the party who prevailed on *most* of her claims.[379] Courts interpret the term "prevailing" to mean that a party need not be successful on all claims, but rather must succeed on a

---

[377]    *Zutrau v. Ice Sys., Inc.*, 2013 WL 1189213, at *8 (N.Y. Sup. Ct. Mar. 20, 2013).

[378]    For the purposes of Rule 54(d), costs include "expenses necessarily incurred in the assertion of a right in court, such as court filing fees, fees associated with service of process or costs covered by statute. . . . [I]tems such as computerized legal research, transcripts, or photocopying are not recoverable." *See FGC Hldgs. Ltd. v. Teltronics, Inc.,* 2007 WL 241384, at *17 (Del. Ch. Jan. 22, 2007).

[379]    *See id; Brandin v. Gottlieb,* 2000 WL 1005954, at *27.

general majority of claims.[380]  Because Zutrau succeeded on important aspects of several of her claims, I award Zutrau her costs under Rule 54(d).

## III.    CONCLUSION

For the reasons stated in this Opinion, I reach the following conclusions.

Count I of the Complaint asserts a derivative claim for breach of fiduciary duty against Jansing, challenging his running of the Company after Zutrau's termination. Although Zutrau ultimately failed to demonstrate a basis for asserting derivative standing in this case, the merits of her derivative breach of fiduciary duty claims were nonetheless relevant to her remaining claims based on the impact the value of those derivative claims might have on the fair value of ICE at the time of the Reverse Stock Split.  As to the merits of the derivative claims, Zutrau succeeded in demonstrating that Jansing breached his fiduciary duties to ICE by causing ICE to pay interest on amounts that he withdrew from ICE's Credit Line and placed into his personal bank account, by charging certain personal expenses to his Company-issued credit card, and by paying himself excess compensation.  Zutrau did not prove any other breaches of fiduciary duty in connection with Count I.

Count II of the Complaint asserts a direct claim for breach of fiduciary duty against Jansing, alleging that he effected the Reverse Stock Split for the improper purpose of depriving Zutrau of derivative standing and at an inadequate price.  Count III similarly asserts that Jansing violated 8 *Del. C*. § 155 by failing to provide fair value for

---

[380]     *See FGC Hldgs.,* 2007 WL 241384, at *17.

Zutrau's fractional shares in the Reverse Stock Split. I deny Zutrau's claim that Jansing executed the Reverse Stock Split for the bad faith purpose of depriving her of derivative standing and dismiss that aspect of Count II with prejudice. I further hold that the Reverse Stock Split was not entirely fair and violated 8 *Del. C.* § 155, because the Duff & Phelps valuation that Jansing relied upon in valuing Zutrau's shares did not account for Jansing's pre-existing breaches of fiduciary duty and therefore did not provide Zutrau with the fair value of her shares. As a remedy, Zutrau is entitled to receive that fair value.

As detailed in this Opinion and in the Order being entered concurrently with it, estimating the fair value of ICE at the time of the Reverse Stock Split requires making two modifications to the Duff & Phelps valuation. First, a normalizing adjustment to the payroll expenses during the historical period must be made to eliminate the effect of expenses attributable to Jansing's excess compensation on the projections for years 2012 to 2014 and the Terminal Year. Second, the value of the breach of fiduciary duty claims that ICE had against Jansing at the time of the Reverse Stock Split, including prejudgment interest, must be added to the value of the Company. Zutrau is entitled to 22% of the value of that revised fair value of the Company, plus pre and post-judgment interest at the legal rate, compounded quarterly.

I also hold that Zutrau failed to prove the claim asserted in Count IV of the Complaint for equitable fraud and negligent misrepresentation against Jansing. In terms of relief, I deny Zutrau's request for rescission of the Reverse Stock Split and for dissolution of ICE based on Jansing's breaches of fiduciary duty and other alleged

112

misconduct.  Finally, I deny and will dismiss with prejudice Jansing's counterclaim for a setoff of the judgment awarded to Zutrau in the New York Action against any relief she obtains in this action.

The parties shall cooperate in implementing the procedure set forth in the accompanying Order to prepare and submit promptly an appropriate form of final judgment and order.